The judgment of the United States Customs Court is *affirmed.*

UNITED STATES *v.* WANAMAKER (No. 2967)[1]

United States Court of Customs Appeals, November 14, 1927

*Charles D. Lawrence,* Assistant Attorney General (*Oscar Igstaedter* and *John F. Kavanagh,* special attorneys, of counsel), for the United States.
*Comstock & Washburn (J. Stuart Tompkins* of counsel) for appellee.

[Oral argument October 6, 1927, by Mr. Igstaedter and Mr. Tompkins]

Before GRAHAM, Presiding Judge, and SMITH, BARBER, BLAND, and HATFIELD, Associate Judges

SMITH, Judge, delivered the opinion of the court:

Merchandise, invoiced as steam engines, was classified by the collector of customs at Philadelphia as mechanical toys under that part of paragraph 1414 of the Tariff Act of 1922 which reads as follows:

1414. Dolls * * * and all other toys and parts of toys * * * not specially provided for, 70 per centum ad valorem.

The importer protested that the goods were steam engines and that they were dutiable at 15 per centum ad valorem under paragraph

---

[1] T. D. 42485.

372 or at 40 per centum ad valorem as articles of metal under paragraph 399. The parts of paragraphs 372 and 399 of the act of 1922 upon which the importer relies in his protest read as follows:

372. Steam engines and steam locomotives, 15 per centum ad valorem.

399. Articles or wares not specially provided for * * * if composed wholly or in chief value of iron, steel, lead, copper, brass, nickel, pewter, zinc, aluminum, or other metal, * * * 40 per centum ad valorem.

The United States Customs Court held that the merchandise was dutiable as steam engines at 15 per centum ad valorem under paragraph 372 and sustained the protest. From the judgment of the Customs Court the Government appealed.

On the trial of the issues raised by the protest the importer introduced Exhibits 1, 2, and 3 as samples of the merchandise, and rested.

William Schoeneman testified on behalf of the Government that he had been engaged in the business of importing toys for 29 years prior to the spring of 1925; that Exhibit 1 was a toy steam engine and that similar merchandise was bought by him from manufacturers of toys and that they were sold to toy stores and to stores selling toys at Christmas time; that Exhibit 3 was a toy and that both Exhibits 1 and 3 have insufficient horsepower for any practical use and have no utilitarian purpose; that he had seen both exhibits in motion and that he had used such merchandise to display to customers and for the amusement of children.

F. W. Trumpore testified on behalf of the Government that he was sales manager of a doll-manufacturing concern and that he had been a buyer of toys for department stores; that he bought toys for Harper & Needham for seven years and had had charge of thirty-odd stores of another firm; that as buyer of toys for Harper & Needham and for said stores he purchased articles such as Exhibits 1, 2, and 3 from toy concerns; that as buyer of toys he bought articles as large as Exhibit 2 or even larger; that he made his purchases abroad from Plant, Arnold & Bing, whose principal business was the manufacture of toy steam engines and magic lanterns; that merchandise of the kind imported was sold by him to parents of children who bought them for their children's amusement; that they were sold by the firm with which he was connected as toys; that he demonstrated the operation of such engines by attaching to them a water pipe and driving it by water pressure; that they would operate a little lathe 2, 2½, or 3 inches high and made little paper figures and things of that kind; that very little steam pressure is required to operate the engine and that they could almost be moved by the breath; that the wholesale price of such engines runs from $1 to $22 or $23. On cross-examination the witness said that engines of the kind represented by Exhibits 1, 2, and 3 are run by steam, but that some engines are operated by water pressure; that the exhibits

were steam engines and that their horsepower was so infinitesimal that it could not amount to much.

William Richey testified for the Government that he was a manufacturer of toy steam engines and that he had been "up against them since 1889 as toys;" that "there has been very active competition"; that Exhibit 2, the largest of the three exhibits, could not be used for anything, as its cylinder was not a real cylinder and that the bore dimension in the cylinder was not real; that the larger part of the cylinder is designed to produce the impression that it is a great power cylinder whereas it is not; that Exhibit 2 is used to amuse children and to run small lathes, little saws, and small figures; that nothing practical can be done with it; that the governor on Exhibit 2 is a "bluff" and does not govern and has no practical use; that the governor is not connected with the cylinder on Exhibit 2; that the governor on a real steam engine controls the steam entering into the cylinder by rising higher as the pressure increases.

The testimony of J. S. Patterson, introduced by the importer, was to the effect that he had been assistant buyer for John Wanamaker for 10 years; that the finer grades of steam engines are known as models and are made of heavy construction all the way through; that in some of the types, steam is produced by alcohol and in others by alcohol or gas; that some are run by gas or alcohol and some by steam; that steam is the power by which they go; that the alcohol mentioned is for the purpose of getting up steam to propel the engine; that such engines range in size from 12 inches to about 20 inches; that they have a heavy brass boiler, a sort of sheet brass, and that the couplings are also of brass; that some of the engines on the invoices serve a useful purpose and are used by grown-ups as well as by children because they are of a model type; that anything sold from $10 up would be a better engine and below that price would be a toy engine. On cross-examination the witness said that the higher-priced engine would be more detailed and have little valves or cocks like large size engines; that the engines which sold for less than $10 and get up steam are used by children only; that the adult plays with engines costing over $10 more than does the youngster because they are more detailed and more complicated; that the play of the adult is, of course, for the youngster's benefit; that the basic principle of construction of the engines whether selling for $8 or $12 is the same but that the higher-priced engine has more detail and quality and is "harder for the youngster to get to"; that it has two or three pet cocks which are too intricate for the little tot to handle; that the invoiced engines are of the better quality and more complicated type; that in 1924 at Christmas time youngsters got the better engine and they were sent back twice for repair because they ruined it; that one of the engines cost $25 or $28 and the father who

bought it handled it all right; that the child burned the boiler of a $10 engine because he did not know how to operate it but that a grown-up might burn the boiler for the same reason; that the child is just as likely to burn a cheap engine as a dear one.

Exhibit 1 is composed of a metal stand, a standing boiler, steam cylinders, and a flywheel to which are attached piston rods that are connected with the pistons of the steam cylinders. The steam cylinders are mounted on a platform provided with a diminutive ladder which extends to the metal base. The ladder which runs from the piston platform to the metal base can not be used by a child and serves no practical purpose whatever. The cylinders are connected with the steam boiler by metal tubes equipped with a very small pet cock to turn on or shut off the steam from the boiler. The boiler is designed to hold less than a pint of water and is fitted with a safety valve, steam whistle, water gauge, and smokestack. Under the boiler is a compartment designed to contain an alcohol lamp. The compartment has four holes for ventilation and is closed by a little metal door. The engine has no steam governor. Three connecting rods, two of which are connected by small screws with the piston rods, and one with the rod of the exhaust valve, work vertically to propel the flywheel and to expel expanded steam. The engine is accompanied by an extra glass water gauge, a small tin cup containing less than a gill, two very small funnels, and printed directions for using the engine. The cup and a funnel are used for filling the boiler. The printed directions are detailed to a degree and disclose on their face that they are designed for the information of those who have not even a rudimentary knowledge of engines. The directions are so minute and specific that it is clear that the engines are not designed to be used as models for the construction of real engines. To instruct an engine builder or an engine building concern as to the uses of a safety valve, a water gauge, pet cocks, and the effect of heat on an engine boiler would be superfluous, not to say insulting.

Exhibit 2, in the main, is made up of a horizontal boiler, two horizontally laid cylinders, and a flywheel, operated by two horizontal shafts connected with the crank shaft and the cylinder pistons. A third horizontal shaft is attached at one end to the crank shaft and at the other to the end of the exhaust valve. Under the boiler is a compartment for an alcohol lamp. The compartment is closed by a metal door and is ventilated by means of holes in the sides which are constructed to imitate ventilators. The boiler is equipped with a whistle, safety valve, water gauge, governor, and manometer for the measure of steam pressure. No printed instructions were attached to Exhibit 2, but an extra copy of such instructions were found with Exhibit 3. Exhibit 3, with the exception that it is much simpler in

design, is substantially the same as Exhibit 1. Exhibit 3 has no piston platform, no ladder, and no door to the compartment for the alcohol lamp.

Taking into consideration all of the testimony in the case, the exhibits in evidence, and the instructions found attached to at least two of the exhibits, we are of the opinion that the judgment of the Customs Court is not sustained by the weight of the evidence. The Government made out a *prima facie* case that the engines had no practical use, served no practical purpose, and were manufactured, bought, and sold for the amusement of children. The exhibits in evidence corroborate the testimony for the Government and the burden was imposed upon the importer of meeting the Government's case. If the engines had any practical use, the importer could readily have shown that they were employed for some other purpose than the amusement of children. We think that the importer failed to make that showing. It is true that Patterson testified that some of the engines would serve a useful purpose; that the engines of the type under consideration were "more of a model" and were of a better quality than those made in this country for children and that they were used by grown-ups. To what useful purpose the engine might be applied Patterson did not state and the record discloses no evidence which would warrant the conclusion that the engines had any practical utility whatever. The engines develop steam by the application of heat to water and there is nothing novel in their make-up which would make them commercially useful as models for manufacturing or patent purposes, and from the testimony and exhibits it can not be fairly deduced that they are *reasonably* fitted for the amusement of normal adults. Parents play with their children and that they do so is a fine manifestation of parental love, but when they do engage in such play and use toy airplanes, mechanical railroads, or put the parts of toy bridges together, their chief pleasure is derived from the amusement thereby afforded to the children rather than from their own use of such articles.

The fact that a thing may prove dangerous to children does not of itself exclude it from classification as a toy. Toy cannons, toy crossbows, and toy rifles and pistols operated by a spring can not be regarded as safe playthings; nevertheless they are toys.

The importer contends that as the goods are toy steam engines, they are more specially provided for as "steam engines" in paragraph 379 than as "all other toys" in paragraph 1414. We can not agree with that contention. In our opinion, Congress intended that paragraph 1414 should include toys of every kind and character except those excluded from its operation by the express terms thereof. In construing the toy paragraphs of the acts of 1897 and 1909, the Circuit

Court for the Southern District of New York and this court held that the provision for "all other toys not composed of china, porcelain, parian, bisque, earthen or stone ware, and not specially provided for" was applicable to all toys save those expressly excluded. *Borgfeldt* v. *United States*, 124 Fed. 457; *United States* v. *Borgfeldt*, 1 Ct. Cust. Appls. 370, 371, 372; *Davies* v. *United States*, 3 Ct. Cust. Appls. 110, 111, 112. The provision for "all other toys not composed of china, porcelain, parian, bisque, earthen or stone ware, and not specially provided for," interpreted by the circuit court and by this court, was substantially reenacted in all subsequent tariff acts and that reenactment must be accepted as a legislative approval of the interpretation given by said decisions to language similar to that found in paragraph 1414.

The judgment of the United States Customs Court is reversed and the case remanded.

*Reversed* and *remanded.*