**No. 63511.**—International Expediters, Inc., and Moen Trading Co. *v.* United States, protests 312836–K and 325691–K (New York).

OLIVER, Chief Judge: These two protests relate to certain electric motors which were assessed with duty at the rate of 35 per centum ad valorem under the provision in paragraph 1513 of the Tariff Act of 1930, as amended, for toys and parts thereof, not specially provided for. Plaintiffs claim that the articles are properly dutiable at only 12½ per centum ad valorem under the *eo nomine* provision for electric motors in paragraph 353 of the Tariff Act of 1930, as amended.

Two witnesses testified. Both appeared on behalf of plaintiffs. The importer, Philip M. Childs, sole proprietor of the Moen Trading Co., identified a sample

of the present merchandise as an electric motor with less than one-tenth horsepower (plaintiffs' exhibit 1). He admitted that he knew nothing about the use or uses of these electric motors and stated that they were delivered to Sterling Plastics Models, Inc., in Philadelphia.

Plaintiffs' second witness, Edward Manulkin, is president of Sterling Plastic Models, Inc. (hereinafter referred to as Sterling), a manufacturer of plastic models, including plastic model boats. Following is a summary of the witness' testimony:

Sterling ordered the merchandise in question through the Moen Trading Co., with the understanding that these electric motors would be designed for use in certain plastic model boats manufactured and sold by Sterling. Sterling has no copyright or formal written agreement covering specifications for these electric motors. The witness stated that there is a "well understood understanding" between Sterling and the importer that the foreign manufacturer is not to sell this particular motor to anyone, except Sterling. At the time of importation, these electric motors had no identifying mark, letter, or word to associate them with Sterling, but after importation they are labeled "L'IL BEAVER—By Sterling." Sterling sells the merchandise to jobbers and distributors (wholesalers) who, in turn, sell them to different outlets, including department stores and hobby stores. We do not accept this line of testimony as establishing that the electric motors in question were specifically designed and exclusively adapted for use in certain plastic model boats manufactured by Sterling.

Referring to certain features which make the electric motors in question suitable for use with Sterling's plastic model boats, the witness testified that the base is made so the motor can be mounted without the use of screws or any other type of fastening device, and the distance from the shaft to the base, as well as the length of the protrusion of the shaft out of the motor, meet requirements to have the motor and the base in proper alignment with the shaft of the propeller when the model boat is put into water for operation. The motor is wired to a plastic battery box that contains an electrical switch and two batteries that supply the power to turn the motor.

Samples are in evidence of the model plastic boats with which the imported electric motors may be used. One of these plastic boat models (illustrative collective exhibit 2) is described on the merchandising carton as "Chris Craft—42″ EXPRESS CRUISER" and identified as "KIT B–14–198." The other (illustrative collective exhibit 3) is designated as "Chris Craft—21″ COBRA KIT B16–298." In both of these model kits, the parts are entirely unassembled and boxed in an attractive merchandising carton that contains detailed instructions explaining how the boat is to be assembled and how the motor may be installed. There is also an advertising circular that recommends the use of the electric motor in question, and also states that "any other motor may be used."

These model boat kits may be used in either of two ways. They may be assembled as shelf models for display purposes; or, they may be assembled and then have the motor fitted for power operation. Under questioning by the court on the matter of use, the witness testified as follows (R. 42–43):

By JUDGE LAWRENCE:

Q. But that is the primary purpose of the Exhibits 2 and 3, to put them into use with a motor, isn't that so?—A. Well, the purpose is twofold. To some the primary interest, in building the models, would be merely for the pleasure of construction and viewing them, without any idea of ever operating them. To others the interest would be not only in building and viewing, but the possibility that at any time they would want they would be able to operate the model in a body of water.

Q. Which is the chief use, for advertising or for actual utility?—A. Would you repeat?

Q. Which would you say is the chief use of exhibits like 2 and 3 in numbers, either for advertising or for practical utility as motorboats with a motor?— A. You mean the end use the model builder would put it to?

Q. Yes.—A. It would be hard to say. I would say that the idea that the models could be powered is one of our sales weapons in the introduction. The field at that time had some overpowering giants in it, that it still has today, and we felt that the only we could introduce such model would be with another point of view, with something extra, different, etc. Therefore, when we designed the models we did design them to fill the purpose of the type of models that were already on the market, and then adding the power feature, which would enable us to get in and do some selling in the market, which was highly, and is highly competitive.

The electric motors in question are never sold with the model plastic boat kits, but are always sold separately.

At this point, it should be emphasized that "The law is well settled that the classification by the collector and his official acts are presumptively correct" (*McKesson & Robbins, Inc.* v. *United States*, 27 C.C.P.A. (Customs) 157, C.A.D. 77), and it is equally "well established that the collector is presumed to have found every fact to exist that was necessary to sustain his classification" (*E. I. du Pont de Nemours & Co.* v. *United States*, 27 C.C.P.A. (Customs) 146, C.A.D. 75). Under those principles, the presumption of correctness attaching to the collector's classification of the present merchandise under the provision for toys and parts thereof includes all the necessary findings by the classifying officer for such classification which is controlled by statutory definition that is set forth in paragraph 1513 of the Tariff Act of 1930, as follows:

\* \* \* As used in this paragraph the term "toy" means an article chiefly used for the amusement of children, whether or not also suitable for physical exercise or for mental development. The rates provided for in this paragraph shall apply to articles enumerated or described herein, whether or not more specifically provided for elsewhere in this Act.

Important to the present discussion is the all-embracive language embodied in the foregoing definition that includes within the provision for toys and parts thereof "articles enumerated or described herein, whether or not more specifically provided for elsewhere in this Act." It follows therefrom that even though the articles under consideration are concededly electric motors, they are excluded from classification under the *eo nomine* provision therefor if they are parts of toys within the meaning of a "toy" under paragraph 1513, *supra*. The principle was expressed in *Louis Wolf & Co., Bing Wolf Corp.* v. *United States*, 19 C.C.P.A. (Customs) 132, T.D. 45258, wherein the appellate court stated that "an *eo nomine* designation of an article in a provision not intended to include toys would not remove the article from the toy paragraph, if in fact it was a toy." The statutory construction was invoked in *United States* v. *Wanamaker*, 15 Ct. Cust. Appls. 310, T.D. 42485, wherein certain toy steam engines were excluded from the *eo nomine* provision for "steam engines" and held to be properly classifiable as toys.

The controlling element in the tariff meaning of the term "toy," paragraph 1513, *supra*, is the matter of "chief use." Plaintiffs' testimony, as hereinabove outlined, is not sufficient to establish that the chief use of the present merchandise is different from that inherent in the collector's classification. The use of the motors under consideration with Sterling's boat kits (illustrative collective exhibits 2 and 3, *supra*), when the models are completely assembled, is entirely optional. The motor is never sold with the kit. Furthermore, plaintiffs' witness, the president of Sterling, was unable to state how often, or to what extent, these electrical motors were used with plastic model boats.

From an examination of the sample in evidence (exhibit 1, *supra*), it appears that the articles in question are ordinary miniature electric motors used in all

sorts of articles, including toys, that are made or constructed to operate electrically. In fact, the president of Sterling, in the course of cross-examination, admitted that the motors under consideration are susceptible of use in toy automobiles, toy fire engines, and toy tanks, if such articles are designed for use with a motor.

It is a fundamental principle in customs law that the plaintiff in a classification case has the twofold burden of proving the correctness of the alleged claim, as well as showing that the collector's classification is wrong. *Joseph E. Seagram & Sons, Inc.* v. *United States*, 30 C.C.P.A. (Customs) 150, C.A.D. 227; *United States* v. *Enrique C. Lineiro*, 37 C.C.P.A. (Customs) 5, C.A.D. 410. On the basis of the present record, plaintiffs herein have not sustained their burden under the cited authorities. We, therefore, hold that the electric motors in question are properly dutiable under the provision for toys and parts thereof in paragraph 1513, as amended, *supra*, as assessed by the collector.

Consideration has been given to all of the cases cited in the briefs of counsel for the respective parties. Reference has been made only to those cases that support the reasoning followed and the conclusion reached herein.

The protests are overruled and judgment will be rendered accordingly.