KATZENSTEIN & KEENE ·(INC.) *v.* UNITED STATES (No. 2678)[1]

USE—EVIDENCE—PARTICULAR IMPORTATION—PAPER-MAKING RAGS—WASTE.

On the trial of a protest against assessment of rags as waste, under paragraph 1457, Tariff Act of 1922, claiming entry free of duty as rags used chiefly for paper making, under paragraph 1651, it was not incumbent on importer to show to what use the particular importation was devoted; and, having shown that the chief use of the kind of rags imported was for making paper, his protest should have been sustained.

## United States Court of Customs Appeals, May 22, 1926

APPEAL from Board of United States General Appraisers, Abstract 50291

[Reversed.]

*Allan R. Brown* for appellant.

*Charles D. Lawrence,* Assistant Attorney General (*Ralph Folks,* special attorney, of counsel), for the United States.

[Oral argument May 11, 1926, by Mr. Brown and Mr. Lawrence]

Before GRAHAM, Presiding Judge, and SMITH, BARBER, BLAND, and HATFIELD, Associate Judges

SMITH, Judge, delivered the opinion of the court:

Cotton rags imported at the port of New York were classified by the collector of customs as waste not specially provided for and assessed for duty at 10 per centum ad valorem under paragraph 1457 of the Tariff Act of 1922, which paragraph reads as follows:

PAR. 1457. Waste, not specially provided for, 10 per centum ad valorem.

The importers protested that the importation was rags for making paper and therefore exempt from duty under that part of the free list which reads as follows:

FREE LIST

SEC. 201. That on and after the day following the passage of this act, * * * the articles mentioned in the following paragraphs, when imported into the United States * * * shall be exempt from duty.

PAR. 1651. Rag pulp; paper stock, crude, of every description, including * * * rags, waste, including jute, hemp, and flax waste * * * and all other waste not specially provided for, including old gunny cloth, and old gunny bags, used chiefly for paper making, and no longer suitable for bags.

The Board of General Appraisers held that the evidence did not establish that the importation was chiefly used for making paper and that the use of the particular importation and the chief use throughout the United States of like material had not been proven. The Board of General Appraisers therefore overruled the protest and the importer appealed.

On the hearing before the board, Harry A. Brody testified that his firm dealt in paper stock and paper-mill supplies and that he had been engaged in that business for 8 years, during which period he had

handled several thousand tons of paper stock rags; that in 1912 his firm had handled about 3,000 tons of merchandise of the class imported; that he purchased the importation from Katzenstein & Keene, and that, when it arrived on the pier, he cut open 10 or 15 bales of the 62 bales imported; that he then pulled out 5 or 6 pieces from the center of the sides of each bale to see whether it was the merchandise that he had purchased, and found that the stock was No. 2 large white rags; that he rejected the merchandise because all of it was of a grade different from that which he had purchased; that the examination made by him of the bales examined was the examination customarily made in his line of business in the buying and selling of rags; that he personally made such examinations every week and sometimes two or three times a week; that the examination made by him was the examination made by paper mills and paper makers in buying rags; that the material which he examined was *used generally in the trade and chiefly for paper making;* that the rags were known to the wholesale trade and were sold to paper makers as No. 2 large white rags; that the rags had buttons on them and that some of them had stripes and were not strictly white, but that "it was not anything but a paper-stock proposition;" that he did not know what was the proportion of the paper-stock business done by his firm, but that he did not know of any firm which dealt in larger quantities in the United States than did his firm; that 100 per centum of the particular type of rags handled by his firm was used for paper making; that the kind of rags in issue was chiefly used in the paper-making trade to make paper; that 100 per centum of the shipments of the type of rags handled by his firm were used for paper making; that his firm, Egress & Co., of Hartford, Conn.; William A. Baker, Chelsea, Mass.; and Rosenberg & Co., located, he believed, in Chelsea, were the largest sellers of material of the class imported; that he did not know of any firm dealing in such rags in Chicago, St. Louis, New Orleans, Philadelphia, Cincinnati, and Cleveland, but that he did know by the shipments that came in that they got practically all of the stock through his firm; that he did not follow *the importation* into the paper factory, and that he did not know to whom it was sold. On cross-examination Brody made the following answers to the following questions propounded by General Appraiser Adamson:

Q. Do you mean you swear that you know that the chief use of rags of this character throughout the United States is by paper mills in the manufacture of paper chief use?—A. I should say.

Q. Do you know that?—A. No; I do not know.

Q. Then you need not say it.—A. The chief use of this particular thing goes to paper makers. That is what I was testifying to.

Q. I am asking you if you know. What use was made chiefly of this merchandise throughout the country, not what you bring in, but the general use of it by paper mills, not by a man selling it, but to make paper out of it—do you know that?—A. Yes, sir.

Q. How do you know that?—A. By being in paper mills when they were using it; seeing them use it.

By Mr. Higginbotham:

Q. What paper mills were you in?—A. I was in the Parsons Paper Co., Holyoke, Mass., and the C. & W. S. Crane, at Dalton, Mass.; the Whiting Paper Co., Holyoke, Mass., and quite a few other large paper mills in New England. I had been in several American writing paper company mills and see them use it.

Q. Mention one in Connecticut that you have been in?—A. The Oakland Paper Co., Manchester, Conn.

Q. Anywhere else besides Connecticut and Massachusetts that you have been in?—A. Paper mills, you mean?

Q. Yes.—A. Yes.

Q. Where?—A. Middletown, Ohio; that was the W. B. Ogelsby Paper Co.

Q. In all of these—— A. I have been in several others.

Q. In other States?—A. Other States.

Q. What others?—A. The John A. Manning Paper Co., Grand Island, N. Y.

Brody then stated that the John A. Manning Paper Co. and the Ogelsby Co. did not use rags of the class imported, but that the other companies mentioned by him did use them; that in the mills he saw cotton rags used for wiping machinery, but that the rags used as wipers were not similar to the rags of the importation; that the mills mentioned by him were the principal ones in the United States, and had the bulk of the paper manufacture in the United States, and that he based his statement on the size of the concern, on the stock used, and the quantity used. On redirect examination the witness stated that rags of the kind imported were used to make good bristol board and stock paper, but were not used for making newspaper or writing paper; that the buttons, hooks, and eyes were taken off the rags by the paper mill.

Herbert P. Brock, general manager of the Waste Material Trading Corporation, testified for the importers that his firm dealt in rags at wholesale and imported rags; that he had handled rags for 25 years, and that cotton rags were classified in the trade as cottons, white, blue, blue cotton, white and red, under separate numbers; that the different kinds of white rags were Nos. 1, 2, 3, and 4, and white wipers; that No. 2 large white rags meant a large white muslin garment, heavy in texture and clean; that such rags are derived from undergarments of muslin and have buttons and things like that on them; that 98 per centum of No. 2 large white rags go mostly to mills for making fine paper, such as stock and ledger paper; and that that was true in September, 1922; that cotton cloth rags are generally sorted before they come in, but if they come in unsorted they are sold to the paper mills; that the grading of cotton rags into Nos. 1, 2, 3, and 4, red, white, and blue, is done by the packers in Europe; that he never saw a No. 2 rag used for wiping machinery; that the wipers he saw used were of a better grade of rags than No. 2 large white.

Adolph Katzenstein, president of the importing corporation, testified that he had been dealing in and handling paper stock for 41 years; that white rags are divided according to cleanliness and physical condition into classes known as extra No. 1, No. 1, No. 2, No. 3, and No. 4. That the No. 2 rag is not as clean and strong as No. 1, and has foreign material such as buttons, rubber, and metal attached to it; that No. 2 white large rags are used only for paper making; that the rags here the subject of protest were sold by him to H. C. Loveland & Co.; that that firm did not take them and he sold them to another dealer; that No. 2 white rags are inferior in material to wipers; that there are two kinds of wipers, wipers that are used by paper mills and wipers that must be large and clean for polishing and cleaning; that rags used for polishing and cleaning must be sterilized, thoroughly washed, disinfected, and light in texture, and therefore "these rags are sold as paper stock;" that the rags imported according to the description of them by Mr. Brody were paper stock; that wipers are first-class articles and are acceptable to the paper mills and whether large or small are suitable for making paper; that when sales are made of No. 1 grade, wipers are left in, as very often paper mills buy white rags under that condition; that if the rags are soiled they do not belong to No. 1 grade.

The evidence hereinbefore recited was left wholly unimpeached and uncontradicted by the Government. Fairly construed and fairly analyzed, the testimony for the importers establishes the following facts: First, that the rags were No. 2 white rags derived from underclothing and had buttons on them; second, that wipers were a higher grade rag and were not classified as No. 2 rags; third, that wipers were fit for and used for paper making, and that in the No. 1 grade of rags paper mills very often made it a condition that wipers should not be removed; fourth, that No. 2 rags were sold to paper makers and were chiefly used for making paper, and that no other use for them was known to the witnesses.

The importer was not bound to show to what use the particular importation was devoted. Indeed, evidence of the use of the particular importation would not by itself have established the chief use of the *kind* and *class* of merchandise to which the importation belonged inasmuch as the use to which a single importation is put falls short of proving the chief use of that class or kind of merchandise. In the tankage cases it was shown that tankage was used for fertilizer purposes, for food for animals, and for other purposes. We regarded the several kinds of tankage as different commercial commodities and held that the chief use of each particular kind or class of tankage must be proven. Tankage is a generic term which embraces all kinds of tankage, and we accordingly decided that proof that tankage was chiefly used as a fertilizer was insufficient to prove the chief use of

the particular kind of tankage actually imported. To have held otherwise would have resulted in admitting as a fertilizer tankage which was either not chiefly used or not used at all for that purpose. See *United States* v. *Wakem & McLaughlin (Inc.)*, 13 Ct. Cust. Appls. 37, T. D. 40867.

The unimpeached and uncontradicted evidence submitted by the importer proved *prima facie* that rags of the kind imported were chiefly used for making paper, and in our opinion the judgment of the board is unsupported by the testimony in the case and against the evidence set out in the transcript.

On the record as made we must hold that goods of the kind and class imported are chiefly used for making paper and that they are therefore paper stock entitled to free entry as provided by paragraph 1651 of the free list.

The judgment of the board is therefore *reversed.*