(C. D. 1541)

INTERNATIONAL MODELS, INC.
VICTORY SHIPPING CO., INC. } *v.* UNITED STATES

## United States Customs Court, First Division

(Decided July 8, 1953)

Barnes, Richardson & Colburn (*Joseph Schwartz* and *Edward N. Glad* of counsel) for the plaintiffs.

*Warren E. Burger*, Assistant Attorney General (*Joseph E. Weil*, special attorney), for the defendant.

*Lamb & Lerch* (*David A. Golden* of counsel) as *amicus curiae*.

Before OLIVER and MOLLISON, Judges

OLIVER, Chief Judge: This case relates to merchandise described on the invoice as "25 sets H. O. gauge Freight electric locomotive completed," exported from Japan in September 1948 and imported at New York by International Models, Inc. The collector classified the articles under the provision in paragraph 1513 of the Tariff Act of 1930 for "all other toys * * * not specially provided for, 70 per centum ad valorem."

Although several claims are alleged in the protest, only two are pressed. Plaintiffs claim classification for the merchandise either as articles composed wholly or in chief value of base metal, not specially provided for, under paragraph 397 of the Tariff Act of 1930, as modified by T. D. 51802, with a dutiable rate of 22½ per centum ad valorem; or, as articles having as an essential feature an electrical element or device, under paragraph 353, as modified by T. D. 51802, carrying a dutiable rate of 15 per centum ad valorem.

The pertinent provisions of modified paragraphs 397 and 353, *supra*, read as follows:

[PAR. 353.] Articles suitable for producing, rectifying, modifying, controlling, or distributing electrical energy, and articles having as an essential feature an electrical element or device, such as electric motors, fans, locomotives, portable tools, furnaces, heaters, ovens, ranges, washing machines, refrigerators, and signs; all the foregoing (not including electrical wiring apparatus, instruments, and devices), finished or unfinished, wholly or in chief value of metal, and not specially provided for:

\*  \*  \*  \*  \*  \*  \*

    Other articles (except machines for determining the strength of materials or articles in tension, compression, torsion, or shear; flashlights; batteries; vacuum cleaners; and internal-combustion engines) ____
                                                  15% ad val.

[PAR. 397.] Articles or wares not specially provided for, whether partly or wholly manufactured:

\*  \*  \*  \*  \*  \*  \*

    Composed wholly or in chief value of iron, steel, lead, copper, brass, nickel, pewter, zinc, aluminum, or other metal (not including

platinum, gold, or silver), but not plated with platinum, gold, or silver, or colored with gold lacquer:

\*       \*       \*       \*       \*       \*       \*

Other (except slide fasteners and parts thereof)_ _22½% ad val.

Of primary consideration is whether the present merchandise is a "toy," within the statutory definition of the term, set forth in paragraph 1513, as follows:

\* \* \* As used in this paragraph the term "toy" means an article chiefly used for the amusement of children, whether or not also suitable for physical exercise or for mental development.

Thus, the question before us is a matter of "chief use," and where the statutory language under discussion includes specifically the words "chiefly used," as they appear in the foregoing definition, then it is the chief use at the time of the importation that controls. *Wilbur-Ellis Co. et al.* v. *United States*, 18 C. C. P. A. (Customs), 472, T. D. 44762; *H. J. Baker & Bro.* v. *United States*, 37 C. C. P. A. (Customs) 52, C. A. D. 419.

A sample of the present merchandise is before us (plaintiffs' exhibit 1). It is a miniature locomotive (approximately 3¼ inches in length) made of metal that appears to be brass. However that may be, the parties have stipulated that the article is "composed wholly or in chief value of iron, steel, copper, brass, nickel, pewter, zinc, aluminum or other metal, but not of or plated with platinum, gold, or silver, or colored with gold lacquer."

The president of the importing corporation, an importer and distributor of model trains, boats, and airplanes, testified that the merchandise in question is sold to hobby jobbers, hobby dealers, and also (through the medium of a mail-order business) to hobbyists. Referring to the phase of this importer's business dealing with model trains, the witness stated that the corporation specializes in two gauges, i. e., "HO" gauge and "O" gauge. The term "gauge" relates to a type of construction; "O" gauge is scaled to ¼" to the foot, and "HO" gauge is approximately one-half of that scale, or 3.5 millimeters to the foot. The present merchandise is "HO" gauge.

The witness identified the locomotive in question as an "0–4–0 switcher," which he described as a model of the type that "is used in switch yards for changing freight around or even on sleepers, taking them around from track to track." The article is made to run by electricity. It contains a "DC" motor and operates with the aid of an electrical device, known as a "powerpack," which is a combination transformer and rectifier that serves to change current and transform voltage. The locomotive in question is manufactured, "as nearly as mechanically possible," according to scale under specifications issued by the National Model Railroad Association. The item under

consideration is completely assembled, although the same invoice, covering the present shipment, included so-called "kits," which are the same articles in a knocked-down condition. (It might be added that the "kits" were not classified as toys and, therefore, are not involved in this litigation.)

In its imported condition, the locomotive in question is unpainted. When it is used in a railroad layout, it is finished to simulate the particular train of which it is a model, by being painted with the appropriate colors and showing "the number of the locomotive as used by the railroad company and also the decalcomania showing what railroad it is from."

The importer has imported articles like the locomotive in question during the past 4 or 5 years. Sales of such merchandise have been principally to adults, who engage in model railroad building as a hobby. A hobbyist, whose diversion is the arrangement of railroad layouts and the operation of model trains, is known as a "duffer." The characterization was applied by the witness to himself, as one who has a railroad layout in his home, which includes a locomotive, like the present merchandise, that has its "proper place in the switch yard." In such use, the witness employs a "powerpack," that converts the "AC" current of his home to the "DC" current used to operate the motor, and transforms the voltage for satisfactory operation of the train layout.

The witness' personal use of the present merchandise in a model railroad is typical of its chief use which is by hobby clubs. These are organizations whose membership consists entirely of adults. They have public exhibitions at which they display their "entire layout of the track with all the stations and tunnels and so forth," the complete arrangement being a miniature railroad. The hobby clubs have no merchandise to sell, but in connection with their exhibitions "they give a pamphlet or listing of what is being exhibited at the exhibition and they sell space there to manufacturers and dealers * * *." (R. 16.) The witness' experience with hobby clubs extends over a period of 20 years, having attended their exhibitions "sometimes twice a year; sometimes more often." He referred specifically to such clubs located in the New York area (one at the "D. L. & W." station in Hoboken, N. J., and the other in Westchester at the White Plains Station), Philadelphia, Boston, and Chicago. At all times, the displays were arranged and operated by adults. Children were not present at any of those exhibitions.

In addition to the principal use of these locomotives by adults (hobbyists) for their own amusement, the witness stated that the present merchandise has been used in television studios to represent large trains and also "by motion picture studios to film wrecks in miniature."

On cross-examination, the witness was questioned at length concerning trains and train equipment manufactured by the A. C. Gilbert Co. and the Lionel Corp. Particular reference was made to the "American Flyer HO Gauge Trains" (defendant's illustrative exhibit C), manufactured by the A. C. Gilbert Co., which the importer herein has purchased and sold to "different hobby stores." The witness' observation of "Gilbert" trains in use has been only after they have been converted "by removing the wheels and trucks and putting true scale trucks on them," enabling them to operate as scale trains in the same way as the imported merchandise in question. He did not regard the "Gilbert" products to be competitive with plaintiffs' merchandise.

Equipment manufactured by the Lionel Corp. is materially different from the locomotive under consideration. "Lionel" trains run on a three-rail track that is distinguishable from the true scale train as represented by the locomotive in question which is "two-rail," one side being insulated and the other side not. The thickness of the flanges and width of track render the "Lionel" equipment incapable of use "by scale model railroads."

Nathan Polk, plaintiffs' second witness, has been engaged for a period of 15 years as a wholesale distributor and retailer of hobbies, toys, and educational materials. His purchases have included articles identical with those in question that he bought from the importer herein. His sales of such merchandise have been to hobby shops, sporting goods stores, hardware stores, and department stores, the principal outlet being hobby stores.

The witness referred to the article under consideration as an "HO locomotive," the symbol, "HO," representing a type of construction that refers not only to the gauge of the track on which the locomotive operates but also to the size, weight, and general features of the locomotive itself. He has seen articles, like the present merchandise, used over a period of 10 years "in homes of model builders and in shops and model railroad shows in which we have exhibited ourselves," and also by hobby clubs, whose membership is composed entirely of adults that average "between thirty and fifty years of age." Hobby shows, attended by the witness, displayed three different types of the "HO" locomotives, including the "Gilbert" type and the article under consideration. In all of those instances, the locomotive in question was used by adults. The use by adults was described by the witness as follows (R. 75):

Well, the actual locomotive and the operating part of their operation—this is the ultimate thing; after the work and labor of layouts and track laying and figuring is all done, then the operation begins of running and of course these people do it realistically on schedules and just don't run them helter-skelter to see how fast they will go. They stop them at the proper depot. Most of the

clubs have time-tables and many men who run these layouts at home print these schedules which I have seen and which have been brought to me.

Hobby shows, sponsored by the witness in his line of business, were conducted in the toy department of department stores, which also displayed model airplanes, ship models, racing cars, and sporting goods.

After stating that the locomotive in question would run with "Gilbert 'HO' equipment," described in the catalog (defendant's illustrative exhibit C), he operated in open court the merchandise before us with the use of "Gilbert" equipment, i. e., track, switches, electric rectiformer (defendant's collective illustrative exhibit F), and later used the "Gilbert" locomotive (defendant's illustrative exhibit G) on the same layout. The witness stated that he had never seen "Gilbert 'HO' equipment" used by children, but he had observed children, as well as adults, watching "Gilbert" layouts in operation and that all evinced pleasure therefrom.

Jacques Jean Du Ponte, the third witness to appear on behalf of plaintiffs, is employed as a maintenance electrician by the Board of Transportation of New York City. He has been engaged in model railroad building, as a hobby, for 17 years, during which period he has been a member of several hobby clubs. One such organization was located in Detroit. Another is the National Model Railroad Association. He is an active member of the Empire Model Railroad Club located in Queens, N. Y., which has a membership of 22, whose minimum age requirement is 19 years. The club is building a layout to simulate the New York Central Railroad, which will include arrangement of track, scenery, and everything essential "to make a replica of some section or division" of that railroad. The layout will be in an "L" shape, about 60 feet long and 30 feet wide.

The witness testified that he owns a locomotive, identical with the article in question, which he designated as a "tank switcher" and that he has used it in his layouts.

In addition to his membership in model railroad clubs, the witness has come in contact with "model railroaders" from "all over the United States." Whenever he has seen locomotives, such as the present merchandise, they were always used by adults, and never by children. He has also observed them being used for advertising purposes, particularly by "the B & O Railroad as an exhibit."

Henry Nolde, plaintiffs' fourth witness, stated that he is a building superintendent, and that he has been interested in model railroads, as a hobby, since 1935, having been associated with the New York Society of Model Engineers from 1935 to 1945, and the National Model Railroad Association, since 1937. At present, he is a member of the Long Island Model Railroad Association. His testimony in connec-

tion with the use of these locomotives is, in effect, the same as that offered by the previous witnesses.

Defendant offered the testimony of four witnesses, all of whom had several years' experience in dealing with and commercially handling toy trains and toy train equipment. In fact, virtually all of the Government's evidence—oral testimony, catalog, as well as the miniature locomotives and related equipment—was connected with the products of the A. C. Gilbert Co. of New Haven, Conn., manufacturer of toys, including trains of both "S" gauge and "HO" gauge. To outline in detail the evidence adduced through each of defendant's witnesses, would unduly lengthen this opinion. Suffice it to say, that in giving defendant's evidence the most favorable consideration toward the Government's position, it can be said that there is a positive showing therefrom that the miniature locomotives of "HO" gauge manufactured by the A. C. Gilbert Co. (defendant's illustrative exhibits A, G, and M) are designed and chiefly used for the amusement of children. In other words, "Gilbert's" miniature locomotives of "HO" gauge meet the tariff definition of a toy, paragraph 1513, *supra*.

From those established facts, Government counsel, in his brief, argues that "merchandise similar to the imported merchandise is chiefly used for the amusement of children," and, therefore, contends that the locomotives in question are classifiable as toys.

The legal phase of the case brings into application the well-established principle that where, as in the issue before us, "chief use" is the determining factor in classifying merchandise, it is the chief use of the class or type of merchandise to which the importation belongs that is controlling. The rule was invoked in a series of cases involving classification of tankage. *United States* v. *Swift & Co.*, 14 Ct. Cust. Appls. 222, T. D. 41706; *United States* v. *Wakem & McLaughlin*, 13 Ct. Cust. Appls. 37, T. D. 40867; *Pacific Guano & Fertilizer Co. et al.* v. *United States*, 15 Ct. Cust. Appls. 218, T. D. 42240. In applying the rule in the *Swift & Co.* case, *supra*, the court said:

From the record in this case it appears that tankage is waste or refuse resulting from the processing of the various parts of animals which are unfit for human consumption, for the purpose of obtaining the fats, oils, and greases therefrom; that there are several (at least three) grades or classes of tankage. What each of these various grades of tankage is chiefly used for does not appear, except that the higher the grade the better it is adapted for use in making stock and poultry feed. * * *

It is evident, therefore, that the question of the chief commercial use of any one of these grades of tankage ought not to be determined by evidence of the chief use of tankage, generally. Nor ought it to be necessary to inquire into the ultimate use of any particular importation. It seems to us that the precise question to be determined in each case of this character, is: What is the chief use of the particular class of tankage to which the importation belongs? In this connection it must not be forgotten that tankage is not named in paragraph 1583. *United States* v. *Wakem & McLaughlin*, 13 Ct. Cust. Appls. 37, T. D. 40867; *Taylor et al.* v. *United States*, 3 Ct. Cust. Appls. 498, T. D. 33162.

The same statutory construction was applied in classifying rags as paper stock. *Katzenstein & Keene (Inc.)* v. *United States*, 14 Ct. Cust. Appls. 143, T. D. 41674.

In this case, we find that there are different classes or types of miniature locomotives. One class embraces toys, including those produced by the A. C. Gilbert Co. and represented by the exhibits hereinabove referred to (defendant's illustrative exhibits A, G, and M). They are completely finished articles, the body of the locomotive being die-cast and moulded in one piece. Each is attractively painted black and bears a number or a name to simulate a locomotive used in industry. Their appearance lends much support to the Government's testimony that they are designed and chiefly used for the amusement of children.

Another class of miniature locomotives is the merchandise in question. Unlike the toys (defendant's illustrative exhibits A, G, and M, *supra*), the present merchandise is made, as nearly as is mechanically possible, according to specifications of the National Model Railroad Association. Individual parts are produced, and then they are soldered together to form the imported locomotives. Furthermore, in their imported condition, these miniature locomotives are unfinished. After importation, each one is painted in appropriate color, and a number, name, or symbol is applied to identify the railroad of which the locomotive is a model, and maybe one or two items are added. A most important distinction between the present merchandise and the miniature locomotives that are toys is that the articles under consideration are identical with "kits," the designation applied to the class of miniature locomotives that are imported in a knocked-down condition for hobbyists to assemble and convert into the desired model.

For the reasons hereinabove stated, we find that the articles in question are not within the class of miniature locomotives that are toys, but that they are distinguishable therefrom both in type of construction and manner of use.

On the basis of the present record, we find that the miniature locomotives in question are chiefly used by adults, for their amusement, in the construction of model railroad layouts, and that additional uses for the present merchandise are for advertising purposes and by moving picture and television studios for theatrical effects. Accordingly, we hold that the articles in question are not toys, as assessed.

Thus, the question for determination is whether the miniature locomotives before us are classifiable under the residuary or catchall provision of paragraph 397, as modified, *supra*, or whether they fall within the more specific provision of paragraph 353, as modified, *supra*, for articles having as an essential feature an electrical element or device.

Paragraph 353 was construed in the case of *United States* v. *Dryden Rubber Co.*, 22 C. C. P. A. (Customs) 51, T. D. 47050, wherein the court stated:

> On the other hand, if, when the article is imported, it is so constructed as to utilize electrical power solely, and, therefore, is, essentially, an electrical article, and its various parts are imported, are intended to be used, and are used, together, as was the case with the imported merchandise, then no reason can be seen why it should not be considered, for dutiable purposes, within the scope of the third division of this paragraph, for in such case, we think the article should be held to be included within the class of articles named in the paragraph.

The record before us is conclusive that the locomotives in question can operate only by electricity. Each is equipped with an electrical motor that operates on direct current. The electrical current is supplied to the locomotive through the insulated side from one of the two rails on which it runs. If the current requires conversion or rectification, the locomotive operates with the use of a "powerpack" which is a combination transformer and rectifier. Summarizing those established facts, we find that these locomotives are so constructed as to utilize electrical power solely, and are essentially electrical articles. Following the *Dryden Rubber Co.* case, *supra*, we hold the merchandise in question to be classifiable under paragraph 353, as modified, and dutiable at the rate of 15 per centum ad valorem, as claimed.

Government counsel and *amicus curiae*, in their respective briefs, refer to and quote from several cases that discuss the statutory definition of a "toy," particularly construing the words "chiefly used for the amusement of children" contained in that definition. *Dessart Bros.* v. *United States*, 60 Treas. Dec. 553, T. D. 45169; *United States* v. *Strauss & Co.*, 13 Ct. Cust. Appls. 167, T. D. 41025; *United States* v. *Wanamaker*, 15 Ct. Cust. Appls. 310, T. D. 42485; *United States* v. *B. Illfelder & Co. and Louis Wolf & Co.*, 17 C. C. P. A. (Customs) 197, T. D. 43646. In view of our approach to the present issue and the reasoning followed to reach our conclusion, it is deemed unnecessary to review the cases cited by defendant and *amicus curiae*.

The claim in the protest, alleging classification for the merchandise under paragraph 353, as modified, *supra*, and dutiable thereunder at 15 per centum ad valorem, is sustained. Judgment will be rendered accordingly.