The motions to amend the protest are, therefore, granted, and order will issue accordingly.

(C.D. 2073)

Polk's Model Craft Hobbies, Inc.
Lansen-Naeve Corp. et al. } *v.* United States

United States Customs Court, First Division

(Decided March 27, 1959)

Barnes, Richardson & Colburn (Edward N. Glad and Joseph Schwartz of counsel) and Brooks & Brooks (J. Joseph McDermott of counsel) for the plaintiffs.

George Cochran Doub, Assistant Attorney General (Mollie Strum and Henry J. O'Neill, trial attorneys), for the defendant.

Lamb & Lerch (David A. Golden of counsel) as amicus curiae.

Before OLIVER, MOLLISON, and WILSON, Judges

OLIVER, Chief Judge: The protests enumerated in schedule "A," hereto attached and made a part hereof, relate to miniature locomotives, and other miniature railroad cars, with track, and accessories. All of the items in controversy are described in schedule "A," which also shows the exhibit number under which a sample of each of the individual items was received in evidence. The merchandise in question was classified as toys, or parts of toys, not specially provided for, under paragraph 1513 of the Tariff Act of 1930, as amended, and was assessed with duty at 50 per centum ad valorem, or 35 per centum ad valorem, or 25 per centum ad valorem. The assessments at 35 per centum ad valorem and 50 per centum ad valorem were under the provisions in paragraph 1513, as amended by T.D. 52739, supplemented by T.D. 52820, for toys, and parts of toys, not specially provided for, and the assessment at 25 per centum ad valorem was under the provision in paragraph 1513, as modified by T.D. 51802, for toys, not specially provided for, that are figures or images of animate objects, wholly or in chief value of metal, not having any movable member or part, and valued at 21 cents or more per pound.

Plaintiffs claim that these articles are not toys and urge classification under various tariff provisions, either based on the component mate-

rial of chief value, or as articles having as an essential feature an electrical element or device, or under a specific descriptive provision. By virtue of stipulations entered into between counsel for the respective parties, there is no dispute concerning the component material of chief value in those items where such element is controlling in the classification of the merchandise, or of the articles having as an essential feature an electrical element or device where such provision has application, or of descriptive tariff language that applies to certain items. In other words, the sole question before us is whether these various items are toys. If they are, then the collector's classification must be sustained; otherwise, plaintiffs' claims must be upheld.

The issue thus presented is governed by the statutory definition of the word "toy" and judicial interpretation of the controlling phrase embodied therein. In paragraph 1513 of the Tariff Act of 1930, the definition of the term "toy" is set forth as follows:

* * * As used in this paragraph the term "toy" means *an article chiefly used for the amusement of children,* whether or not also suitable for physical exercise or for mental development. The rates provided for in this paragraph shall apply to articles enumerated or described herein, whether or not more specifically provided for elsewhere in this Act. [Italics supplied.]

Referring to the phrase, "used for the amusement of children," as it appears in the foregoing definition, our appellate court, in *United States* v. *Abercrombie & Fitch Co.,* 20 C.C.P.A. (Customs) 267, T.D. 46060 (at page 271), stated that:

* * * Congress, by its use of the phrase "used for the amusement of children," did not mean for the use of grown-up children or youths, but children who, by reason of youth and lack of mental development, were incapable of great mental exercise in deriving amusement.

It will be further noted that the question before us is one of "chief use" and that where, as in the statutory definition of the term "toy," the words "chiefly used" are used, then it is chief use at the time of the importation that controls. *H. J. Baker & Bro.* v. *United States,* 37 C.C.P.A. (Customs) 52, C.A.D. 419.

Counsel for the respective parties stipulated, during the course of the trial, that the articles, represented by the item described on the invoice with protest 319347–K as "100 Wrenches to fasten masts on bases TST," are not toys, and that they are hand tools within the class provided for in paragraph 396 of the Tariff Act of 1930, as modified by T.D. 52739, supplemented by T.D. 52820. On the agreed facts, we hold the item referred to, to be properly classifiable under paragraph 396, as modified, and dutiable thereunder at the rate of 22½ per centum ad valorem, as claimed by plaintiffs.

The basic issue now before us, i.e., whether or not miniature railroad equipment made to run on HO scale track are toys, has been

the subject of previous litigation. *International Models, Inc., and Victory Shipping Co., Inc.* v. *United States*, 31 Cust. Ct. 24, C.D. 1541, and *United States* v. *E. B. Miller Associates, Inc., J. M. Rodgers Co.*, 43 C.C.P.A. (Customs) 14, C.A.D. 603. *The International Models, Inc., et al.* case, *supra*, involved only one item, a miniature locomotive identified as an "0–4–0 switcher," imported in an unfinished, unpainted condition. In that case, this court sustained plaintiffs' contention and held that the locomotive was not a toy and that it was properly classifiable as an article having as an essential feature an electrical element or device. No appeal was taken from that decision. The *E. B. Miller Associates, Inc., et al.* case, in which the record in the *International Models, Inc., et al.* case was incorporated, involved miniature railroad locomotives and parts therefor, and miniature railroad coaches, all of which were painted in appropriate colors with a name, symbol, or printed matter, identifying the articles as models of certain railroad equipment used on English railroads. In upholding the collector's classification of the merchandise as toys, our appellate court, in the *E. B. Miller Associates, Inc., et al.* case, concluded as follows:

We have carefully examined the entire record, including the record in the incorporated case, and do not think the evidence is sufficient to overcome the presumption of correctness which attaches to the collector's classification.

The two cited cases are decisive of the questions there presented based on the record in each case. They are not controlling of the issue presented in the voluminous record now before us. The present case has a more complete record which embodies testimony relating to different phases of the use of this HO equipment that were not before us in the *E. B. Miller Associates, Inc., et al.* case. The more comprehensive record herein supports conclusions different from those reached in the *Miller* case.

Forty witnesses testified. Twenty-seven appeared on behalf of plaintiffs; 13 testified for defendant. In addition, there were received in evidence 37 exhibits, that include samples of the items under consideration, as well as certain articles and advertising matter illustrative of or related to train sets and equipment like the merchandise in question.

All of the locomotives, the different kinds of miniature railroad cars, and the track included in the train sets under consideration, consist of HO equipment. The term "HO," has reference to a scale of gauge, or a scale of manufacture, "3½ millimeters, representing one foot." (R. 175.) Trains of HO gauge run at scale speed. Sixty feet a minute is the maximum speed at which such trains should be run to simulate the operation of a modern railroad. It is agreed between the parties that all of the HO equipment in question has been manu-

factured according to rigid standards set up by the National Model Railroad Association, which is "an organization of adult model railroad hobbyists formed in 1935 to make and promulgate standards for wheels, flanges, rails, switches, and other working parts of model railroads, with the purpose of achieving interchangeability of equipment from different manufacturers." (R. 23.)

The locomotives and other miniature cars or trains in question are completely assembled, or ready-to-run, HO equipment, as distinguished from so-called kits. A kit, as shown by the record herein, is an HO locomotive or other miniature railroad car in a knockeddown condition which must be assembled before being susceptible of its ultimate use (defendant's exhibit B). Considerable reference is made throughout the record to kits and the comparative use between them and the ready-to-run equipment in question. The tariff treatment of kits has no bearing on the classification of the present merchandise. Hence, testimony in connection with kits is not pertinent to the question before us.

Officials of the plaintiff corporations testified concerning the various items handled by their respective companies. The treasurer and sales manager of Polk's Model Craft Hobbies, Inc., "wholesalers and distributors of hobby and educational materials," stated that his company has handled all of the items in question for more than 5 years, or since the merchandise has been imported, and that he sells these articles to "hobby distributors and hobby shops; hobby departments in department stores, primarily." He testified that he has seen this merchandise used in model railroad clubs which he described as units composed of adults whose hobby is to work in unison in building a model railroad layout. He stated, further, that he has also seen this HO equipment used for display purposes by industrial establishments and in stores to attract customers. Testifying further on the matter of use, the witness stated that he has seen members of model railroad clubs "super-detail" or add fittings to HO locomotives or railroad cars to give them greater likeness to the equipment on a standard railroad. In this connection, he referred to the caboose (part of plaintiffs' collective exhibit 3), which has holes drilled that will permit the modeler to fit ladders, or a railing, or steps on the side, and to the locomotive (plaintiffs exhibit 5), showing that it is designed to be equipped with piping and grab rails, and a light, which the modeler can add and have a more detailed locomotive.

Explaining the necessity to have HO track absolutely level for a train to run, the witness referred to the so-called "fish-plates" (part of plaintiffs' collective exhibit 20), which he describes as "the plating connecting the two pieces of rail" (R. 194) that is used to grip the track permanently. He stated that, unless the track is firmly laid, the

"fish-plates" cannot hold the track properly which would cause it to come apart.

The witness identified the power pack (plaintiffs' exhibit 10) as "a transformer rectifier unit combined" (R. 205) that not only reduces the voltage but also converts the current from alternating to direct current. He stated that this power pack is particularly adaptable for HO equipment where the trains operate on direct current and the accessories operate on alternating current. The witness distinguished the power pack from the ordinary transformer, which merely converts current without modifying or reducing voltage and that is used with trains that are larger than the HO equipment.

The president of Charles C. Merzbach Co., a plaintiff herein, stated that he has been an importer and distributor of model railroad equipment, particularly Fleishmann products, since 1952, when such HO equipment was first produced; that, during said period, he visited homes located throughout the United States in which he saw temporary, as well as permanent, layouts, of HO equipment; and that, in each of the homes he visited, the layout was owned and operated by adults. Based on his observation of the operation of HO layouts in homes, the witness stated that children, between the ages of 9 and 12, were not interested in such equipment. He distinguished between temporary and permanent layouts as follows (R. 291):

A temporary layout would normally be put on some kind of a table—a ping pong table or sometimes even a card table, where the items might be put away, and in others, would slide away under a bed, sometimes. And a permanent layout, on the other hand, would have some landscaping; very often, the people would follow plans that we furnish them in our layout book, * * *.

Referring to the skills required for a person to set up and operate either a temporary or a permanent layout, the witness testified as follows (R. 291–292):

It requires a knowledge of electricity and it requires a thorough understanding of how the trains operate. For example, our accessories all operate on alternating current; our trains run on direct current. It's necessary to know the two types of current which our power packs provide, to connect up the wires correctly. In the case of the alternating current, they have a—they have two leads; one would be a common terminal, connecting all the different accessories and switches, and another one would be a specific one which would go to each individual switch. There again, I may refer you to the manual, and even to follow the manual requires some skill and some coordination.

In further description of the complexities associated with the operation of HO equipment, the witness referred to the locomotives (plaintiffs' exhibits 6, 9, 23, and 24), which, he stated, "can also be operated from an overhead wire through pantographs they have located on the roof. This makes it possible to operate two trains on the same track under independent control. To do this, it is necessary to set up a

catenary system, which is an overhead wire system, such as the Pennsylvania and New Haven Railroads use in this area. This, naturally, requires wiring." (R. 294.)

Of the 27 witnesses called by plaintiffs, 11 stated that they are interested in model railroading as a hobby. One of these witnesses stated that the use of HO equipment by hobbyists "is a sort of do it yourself hobby of building a miniature world, or a scale model replica of things that you might see in a railroad system." (R. 7.) The hobbyists who appeared as witnesses are drawn from all walks of life and include dentists, technical consultants, salesmen, and others who are engaged in different lines of business, but all of whom have a special interest in model railroad building. Some of them are members of model railroaders' clubs, composed of adults who are hobbyists motivated by the common interest of building and operating model railroads with the use of HO equipment. They use HO equipment in the construction of their railroad layouts, which may range from a simplified arrangement to an elaborate display. Exemplary of their line of testimony is that which was adduced through Dr. John Feminella, a dentist, whose familiarity with the imported merchandise has been acquired through personal use thereof in the construction of eight model railroad layouts. Explaining the particular layout he has in his own home, the witness testified as follows (R. 324–325):

Q. And in making your layout—your track layout, what did you have to do?— A. Well, in our case, we planned beforehand, the size of the layout, and the number of trains and the kind of operation that we thought we would like, and we made a model of that on some oaktag. For example, we felt right off that knowing some of the possibilities of these trains that we would like them set up automatically, so that with relays in a small space, we would have more than one train, and in our case, five operated, independently controlled, and controlled to the extent that where there were any crossovers or where one took another track, there would be automatic control for the oncoming train, so there would be no collision.

Q. Did this require any cutting of rail or soldering of rail or intricate knowledge of electricity?—A. A great deal of cutting of rail and making my own interrupters; making my own contacts, which would make or break a circuit at different places; soldering jumper wires from dead sections of track to live sections of track, and having a relay then enervate the dead section when the train got at a certain point. * * *

He testified that, after completing the layout, he added scenery and miniature figures and equipment, such as the so-called "track siders" (plaintiffs' exhibit 11 and plaintiffs' collective exhibit 12). Included in some of the eight model railroad layouts that the witness constructed were the tower (plaintiffs' exhibit 14), the cable car set (plaintiffs' exhibit 15), and the trolley bus (plaintiffs' exhibit 32). He stated that the fitting or the installation of those articles in a layout required a great deal of patience and particular skills. In

connecting the tower, it was necessary to do some soldering and certain wiring to avoid a short circuit. The cable car set is an intricate arrangement that presents difficulty in spanning the cables; knowledge of pulley systems is required to get the cable car in operation. To fit the trolley bus into a model railroad layout, involves most exacting detail so that the wires which control the trolley bus poles are set in proper position to prevent undue straining that would cause the wires to snap and result in short circuits and possible fire.

Referring to the train sets, consisting of a locomotive, cars, and sections of track (plaintiffs' collective exhibits 17 and 19), the witness stated that special skills are required to set up and operate such train sets. Explanatory thereof is the following excerpt from his testimony (R. 338):

It would take setting up this track, in the first instance, so it would have a place to run. It would take some knowledge on the part of the individual who was going to plug in that plug, to know first, that he just couldn't plug a transformer into the wall; that these trains ran on direct current, and that the current that's supplied into the house is alternating current, and that some kind of a device was necessary to change this current from alternating current to direct current. * * *

The witness testified, further, that the operation of train sets like those in question requires knowledge of electricity to know the function of the transformer-rectifier (exhibit 10, *supra*), which is essential to the operation of such train sets. He stated that the size of the track and its delicate construction, as well as an ability to snap the sections of track in place, make the setting up of these train sets something beyond the capabilities of a child under 13 years of age.

A manufacturer of HO train accessories, who has been familiar with the equipment in question since it has been imported, referred specifically to the trolley bus (exhibit 32, *supra*), for which he wrote the original instructions. He stated that setting up this piece of equipment is no "simple thing" (R. 352), particularly with reference to the wiring. Two overhead wires must be curved to a proper radius that is done by means of a tool supplied with the set. The work is something that "the average adult can do," but "it's out of the question for any child to set it up and operate it." (R. 352.)

Owners of retail hobby stores that handle merchandise like that in question also testified on behalf of plaintiffs. Their combined experience includes the actual use of HO equipment in the construction of layouts for customers, either in homes or for commercial display in stores and industrial establishments. These witnesses also testified that they had seen HO equipment, such as the articles in question, used in homes and in model railroad clubs; that this equipment was always used by adults for their satisfaction, either as a hobby

or for their amusement; and that they were never used by children under the age of 13, even though they were in a position to operate the equipment, if capable.

Plaintiffs also introduced the testimony of editors, publishers, and writers of books and magazines that deal with model railroad building. In addition to their association with the publication of articles about HO equipment, these witnesses are model railroaders who engage in their hobby as members of clubs that are composed entirely of adults. Their testimony on the matter of use is to the effect that HO trains, with the parts thereof and accessories thereto that are involved herein, are chiefly, if not exclusively, used by adults, and that children have no interest in such equipment. An organizer of two model railroad clubs testified that an attempt to enlist into the membership children, less than 13 years of age, proved to be a failure, and that when younger children visited the club they showed their lack of interest by destroying pieces of equipment. The editor of the "Railroad Model Craftsmen Magazine," testifying for plaintiffs, referred to the train set (exhibit 17, *supra*) and the power pack (exhibit 10, *supra*) and testified that, while an intelligent child, 12 years of age, could set up the combination, "He would have to have a good sense of mechanical ability to put the track together; he would have to have some knowledge of electricity." (R. 374–375.)

Testimony of plaintiffs' witnesses concerning the display of HO equipment, either in toy departments or hobby departments of stores, is not indicative of actual use of this merchandise and, therefore, has no influence in determining whether the present merchandise consists of toys for tariff purposes. It is also immaterial to the issue before us that this HO equipment in question is shown at trade shows where all sorts of merchandise are exhibited.

Advertising matter (plaintiffs' illustrative exhibits 27 and 28, and plaintiffs' exhibits 34 and 35), relating to HO equipment, similar to the merchandise in question, is in the nature of sales promotion and not evidence of actual use.

Defendant's testimony does not contradict plaintiffs' evidence concerning the radio and television tower (plaintiffs' exhibit 14), the cable car set (plaintiffs' exhibit 15), and the trolley bus (plaintiffs' exhibit 32). An examination of the samples of those articles confirms the statements of plaintiffs' witnesses to the effect that these items are used by adults in their hobby of model railroad building and that they are not chiefly used for the amusement of children. Accordingly, we hold those articles, the parts thereof, and the accessories thereto, all of which are enumerated on the invoice with entry 824335, covered by protest 319347–K, to be dutiable as follows: The invoice items described as "Trolley Bus HO, sets ready to operate, with small

bases," "Cable Car HO, sets ready to operate SK," "Center pieces for Cable Car tower STM," and "Radio & Television Towers, with illuminated lift, airplane warning light 301" are dutiable at the rate of $13\frac{3}{4}$ per centum ad valorem under the provisions in paragraph 353 of the Tariff Act of 1930, as modified by T.D. 52739, for articles of metal, not specially provided for, having as an essential feature an electrical element or device, and parts of such articles, as claimed by plaintiffs; the rubber tires (plaintiffs' collective exhibit 33) for the trolley bus, identified by the invoice description, "Reserve tyres TR/2," are dutiable at the rate of $12\frac{1}{2}$ per centum ad valorem as manufactures of india rubber, not specially provided for, under paragraph 1537(b) of the Tariff Act of 1930, as modified by T.D. 53865, supplemented by T.D. 53877, as claimed by plaintiffs; the so-called bayonet bulbs, described on the invoice as "Bayonet bulbs for front illumination of Trolley Bus HO–STL," are dutiable at the rate of 20 per centum ad valorem under the provision in paragraph 229 of the Tariff Act of 1930 for incandescent electric-light lamps, with metal filaments, as claimed by plaintiffs; and the merchandise described on the invoice as "FALLER Mountain Station Houses for Cable Car set SB 1" or "FALLER Valley Station Houses for Cable Car SB 2" (plaintiffs' collective exhibit 13) is dutiable at the rate of $17\frac{1}{2}$ per centum ad valorem under paragraph 1413 of the Tariff Act of 1930, as modified by T.D. 52373, supplemented by T.D. 52462, as manufactures in chief value of paper, not specially provided for. Furthermore, there is nothing in defendant's testimony to contradict plaintiffs' evidence with respect to the so-called "track siders" (plaintiffs' exhibit 11 and collective exhibit 12) which are miniatures—either figures of people or pieces of equipment—that are associated with a model railroad setup. Samples in evidence include "Railway Crew," "Watchman's Hut," "Coal Bunker," "Water Column," "Sand Bin and Fire Bucket," "Cement Mixer," and "Tractor and Rake." All of these articles are appropriately colored or painted to represent the figure or thing they depict. They are so fragile and of such light construction they could not long withstand use as a plaything by and for the amusement of children. They are designed to remain stationary and make no noise. Their general appearance supports the oral testimony that these items are used as "track siders," designed to complete the layout of an HO model railroad constructed by hobbyists who are adults. Being concededly in chief value of "a zinc base alloy" (R. 225), this merchandise, which is represented by the items enumerated on the invoice with entry 731463, covered by protest 294819–K, is dutiable at the rate of $22\frac{1}{2}$ per centum ad valorem under paragraph 397 of the Tariff Act of 1930, as modified by T.D. 51802, as manufactures in chief value of base metal, not plated with platinum, gold, or

silver, or colored with gold lacquer, not specially provided for, as claimed by plaintiffs.

There remains for determination the classification of the train sets (plaintiffs' collective exhibits 3, 16, 17, 18, 19, 20, and 21), the loco-motives (plaintiffs' exhibits 1, 2, 4, 5, 6, 7, 8, 9, 23, 24, and 25), the motor coach (plaintiffs' exhibit 22), and the power pack (plaintiffs' exhibit 10). The testimony of plaintiffs' witnesses in connection therewith is cumulative to the effect that those articles are chiefly, if not exclusively, used in model railroad layouts by adults, or youths, either as members of model railroad clubs or in homes, for their enjoy-ment. There is also some testimony showing the use of this HO equip-ment by industrial establishments for purposes of display to attract customers.

Of the 13 witnesses called by defendant, 6 are employees of the A. C. Gilbert Co., a domestic manufacturer of HO equipment, identi-cal with the imported merchandise under consideration. Considerable testimony of this group of witnesses relates to the Gilbert Hall of Science which was described as a showroom or an exhibition hall dedi-cated to the youth of America. One of these showrooms is located in Chicago; the other is in New York. Both are maintained by the A. C. Gilbert Co., doing business in both cities. Both places are exclu-sively used for the display of products of the A. C. Gilbert Co. Prior to 1957, different kinds of merchandise, including layouts of miniature trains, were shown. Since 1957, the display has been limited to train equipment of various gauges. The use of HO equipment at the Gilbert Hall of Science is primarily a project to promote sales of the com-pany's products. That such use may tend to amuse people, either adults or children, is incidental.

The testimony of defendant's witnesses is directed largely to the train set (plaintiffs' collective exhibit 18), consisting of a locomotive, 7 different kinds of railroad cars, and 10 sections of track. Their testi-mony is to the effect that they had seen such a train set, and similar ones, used in homes by young children, ranging in ages from 7 to 12, and that such young children can set up and operate train sets, like those in question, without possessing any special skills or knowledge of electricity. The observations of defendant's witnesses are limited, in the light of the testimony of plaintiffs' witnesses showing actual use of this HO equipment by adults, either as members of model rail-road clubs or as hobbyists interested in model railroad building. Furthermore, the samples before us tend to support plaintiffs' position. All of the articles comprising the train sets in question, as well as the locomotives and the motor coach hereinabove referred to, are fragile and delicate in construction, reflecting adaptability for use by adults

and youths, as stated by plaintiffs' witnesses, rather than as ordinary playthings for children, as suggested in defendant's testimony.

The testimony of defendant's witnesses also includes admissions, corroborative of statements by plaintiffs' witnesses, that HO equipment is used by adults for their amusement. In this connection, we quote from the testimony of the sales manager of the HO division of the A. C. Gilbert Co., where defendant's witness testified as follows (R. 748) :

X Q. Have you ever seen any adults using "HO" trains, operating "HO" trains for their own amusement?—A. Yes, I have.

X Q. How often have you seen adults operating "HO" trains for their own amusement?—A. Several times, I presume.

It is also noted that the record herein shows that the number of homes, where plaintiffs' witnesses observed the use of HO equipment by adults and grownup children or youths, for their amusement, greatly exceeds the number of homes visited by defendant's witnesses, where younger children watched model railroad layouts. The homes, where plaintiffs' witnesses observed the use of HO equipment, covered the entire geographical area of the United States, which is not true with respect to the homes visited by defendant's witnesses.

The preponderance in weight of the evidence—oral testimony as well as samples—supports plaintiffs' contention that all of the articles in question, as hereinabove identified, are not toys, as the term "toy" is defined in paragraph 1513, *supra*; that they are not chiefly used for the amusement of children; and that they are chiefly used by adults and grownup children or youths.

Further consideration of the train sets (collective exhibits 3, 16, 17, 18, 19, 20, and 21, *supra*) is necessary. The collector's assessment of the articles as toys carries the implication they were regarded as entireties. An examination of the samples does not support such tariff treatment. Each of these train sets, except collective exhibit 3, consists of a locomotive, miniature railroad cars ranging from four to seven in number, and sections of track which, when joined, form a circle. The train set, collective exhibit 3, has no sections of track, but consists only of a locomotive and two railroad cars. The articles comprising each set are separate entities, individually identifiable. When they are used together, they retain their separate identities, and each will perform its separate function without loss of its essential characteristics. The combined use of the articles does not create an entirety for tariff purposes. That they may be bought, sold, and used together, in sets, does not require that they be regarded as entireties, for tariff purposes, *Lang Co. et al.* v. *United States*, 15 Ct. Cust. Appls. 341, T.D. 42495. The individual articles, that make up the train sets in question, are dutiable as separate entities, as hereinafter set forth.

The locomotives in question, including those forming part of the train sets, and the power pack, or transformer-rectifier unit (exhibit 10, *supra*), which is used in connection with, and is essential for, the operation of the HO trains and railroad cars in question, all of which articles are identified by the items enumerated in schedule B, hereto attached and made a part hereof, are classifiable as articles having as an essential feature, an electrical element or device, composed in chief value of metal, not specially provided for, under paragraph 353 of the Tariff Act of 1930, as amended, *supra*, with duty assessment at the rate of 13¾ per centum ad valorem, as claimed by plaintiffs. The railroad cars and sections of track forming parts of the train sets, hereinabove identified, are classifiable as manufactures in chief value of base metal, not specially provided for, under paragraph 397, as amended, *supra*, with a duty assessment at the rate of 22½ per centum ad valorem, as claimed by plaintiffs.

On the basis of the entire record before us, and for all of the reasons hereinabove set forth, we hold the merchandise in question to be properly classifiable under the various tariff provisions invoked by plaintiffs, as stated in the course of our discussion herein.

Consideration has been given to all of the cases cited in the briefs filed by counsel for the respective parties and by *amicus curiae*. Our references herein have been confined only to such cases deemed necessary to support the conclusions.

The protests are sustained and judgment will be rendered accordingly.