HUDSON SHIPPING CO., INC. *v.* UNITED STATES

Court Nos. 68/4399, etc.

(Decided August 26, 1975)

*Allerton deC. Tompkins* for the plaintiff.

*Rex E. Lee*, Assistant Attorney General (*Velta A. Melnbrencis*, trial attorney), for the defendant.

MALETZ, Judge: The problem in this consolidated action is to determine the proper tariff classification of three types of ship models in assembled form and of three types of construction kits or sets containing prefabricated units for the assembly of ship models. The imported ship models were represented to be models of three famous

sailing vessels, i.e., (1) the Juan Sebastian Elcano, a schooner which is presently used by the Spanish Navy as a training vessel; (2) the clipper ship Great Republic which was built in 1835 and was the largest sailing ship ever built in the United States; and (3) the Cruz del Sur (the Southern Cross) which is used by the Spanish Government as a training ship. The imported kits were represented to contain prefabricated units for construction of models of the Juan Sebastian Elcano; the Great Republic; and the Eagle, a famous windjammer, which was initially used as a training vessel by the German Navy, but was taken over in 1946 by the United States as a war reparation and has since been used as a cadet training ship of the United States Coast Guard.

The models and kits in question were manufactured by the Constructo Company of Barcelona, Spain (Constructo) and were imported into the United States via the port of New York in 1966 and 1968 by S. T. Preston & Son, Inc. of Long Island, New York (Preston).[1] Upon liquidation, the models and kits were classified by the government under item 737.15 of the Tariff Schedules of the United States which covers other models and construction kits and were assessed duty at the rate of 35 percent or 31 percent ad valorem depending on the date of entry.

Plaintiff claims that all the imported ship models are properly classifiable under item 737.07 of the tariff schedules which covers, among other things, ship models made to scale of the actual article at the ratio of 1 to 85 or smaller and provides for a duty rate of 16 percent or 14 percent ad valorem depending on the date of entry. Plaintiff further claims that the imported construction kits are properly classifiable under item 737.09 which covers construction kits or sets with construction units prefabricated to precise scale of the actual article and provides for a duty rate of 19 percent or 17 percent ad valorem depending on the date of entry. It claims alternatively that the kits are classifiable under item 737.07 as unassembled or unfinished ship models made to scale of the actual article at the ratio of 1 to 85 or smaller.

Defendant's position with respect to plaintiff's claims is that the imported models are not classifiable under item 737.07, since they are not made to the scale of the actual articles at the ratio of 1 to 85 or smaller. As to the imported kits, defendant contends that the construction units contained therein have not been prefabricated to the precise scale of the actual article and thus do not come within

---

[1] The nominal plaintiff Hudson Shipping Co., Inc. is the customs broker for Preston.

the ambit of item 737.09, as claimed by plaintiff. Respecting plaintiff's alternative claim for classification of the kits under item 737.07, defendant argues that construction kits for making or assembling model articles are not covered by item 737.07 and that in any event the kits do not consist of unassembled or unfinished ship models made to scale of the actual article.

Against this background, the primary issues are whether plaintiff has proven (1) that the imported models consist of ship models *made to scale of the actual article* at the ratio of 1 to 85 or smaller, and/or (2) that the imported kits consist of construction kits or sets *with construction units prefabricated to precise scale of the actual model.*

### The Statutes

The provisions of the Tariff Schedules of the United States relevant to the action read as follows:

10. General Interpretative Rules. For the purposes of these schedules—

\* \* \* \* \* \* \*

(h) unless the context requires otherwise, a tariff description for an article covers such article, whether assembled or not assembled, and whether finished or not finished;

\* \* \* \* \* \* \*

SCHEDULE 7. — SPECIFIED PRODUCTS; MISCELLANEOUS AND NON-ENUMERATED PRODUCTS

\* \* \* \* \* \* \*

PART 5. — ARMS AND AMMUNITION; FISHING TACKLE; WHEEL GOODS; SPORTING GOODS, GAMES AND TOYS

\* \* \* \* \* \* \*

Subpart E. — Models; Dolls, Toys, Tricks, Party Favors

\* \* \* \* \* \* \*

Model trains, model airplanes, model boats, and other model articles, all the foregoing whether or not toys; and construction kits or sets for making or assembling such model articles:

737.05   Models of inventions and of other improvements in the arts, to be used exclusively as models_____   \* \* \*

Other models, and construction kits or sets:

737.07   Rail locomotives and rail vehicles; railroad and railway rolling stock; track, including

switching track; rail depots, round houses, signal towers, water towers, and other trackside structures; trolley buses and trolley-bus systems; cable-car systems; highway vehicles; ships and harbor structures; and airplanes and spacecraft; all the foregoing made to scale of the actual article at the ratio of 1 to 85 or smaller------------- 16% ad val. [for merchandise entered prior to 1968] 14% ad val. [for merchandise entered during 1968, T.D. 68-9]

737.09 Construction kits or sets with construction units prefabricated to precise scale of the actual article--------------- 19% ad val. [for merchandise entered prior to 1968] 17% ad val. [for merchandise entered during 1968, T.D. 68-9]

737.15 Other---------------------- 35% ad val. [for merchandise entered prior to 1968] 31% ad val. [for merchandise entered during 1968, T.D. 68-9]

## The Testimony

Helpful in resolving the issues is a summary of the testimony of the two witnesses who appeared at the trial—one for the plaintiff, the second for the defendant. Plaintiff's witness was George H. Rowsom, executive vice president and general manager of the importer, Preston, which is primarily a ship chandler dealing in pleasure boat supplies. It also imports and sells to the general public assembled ship models and construction kits containing the components needed to assemble ship models. The witness started his employment at Preston's where initially he ran the mail order and advertising phases of the business. Subsequently he was given the responsibility for starting a ship model department. His experience in ship model building was derived from assembling five ship models from construction kits. He undertook this task so that he would be in a position to speak authoritatively and help people who had purchased construction kits from Preston's in their construction, as well as answer questions on what procedural steps to take. His additional experience in the ship model field was obtained from going to various hobby shops and trade fairs in order to ascertain what scale models were available and from reading various trade publications, researching various books for ship specifications and viewing paintings and photographs. His company eventually selected Constructo as its supplier because its "models were of the caliber and of the precise scale that we were looking for to offer to our customers." R. 26.

The witness stated that while scale might mean something to some ship model builders,[2] others were totally disinterested in scale. In fact, his customers were mostly interested in scale from the standpoint of wanting to know how large the completed ship model would be so that they would have room to display it. According to Mr. Rowsom, "[a] scale model of a ship would be, in terms of the model builder, one that, in relative detail, approximates the preecis replica of the original." R. 149. The witness explained that what he meant by relative scale is that the components as a complete picture represent what the actual ship looks like as opposed to being mathematically perfect without any tolerances for error. Thus the witness does not normally compute the various dimensions on the imported models mathematically; rather he computes the dimensions by crude measurements, not by micrometer measurements.

Mr. Rowsom further testified that the word "precise" as it concerns the model builder means accuracy within certain allowable tolerances

---

[2] Mr. Rowsom indicated that when he talked about model builders, he was referring to himself and those of his customers who built models.

taking into consideration the equipment, tools and machinery available to prefabricate specific parts. However, he was unable to state what these tolerances were, but he indicated that those who knew something about ship models can almost tell by the eye whether something is in "relative scale" or not. The witness did not agree that all of an article's components had to be increased or reduced in the same proportion to be in scale; thus, he testified that one could have a scale model if the hull had a scale of 1 to 200 and the mast had a different scale of 1 to 150.

He went on to state that in model building, allowances are made for slight variations in scale because component pieces cannot always be made to specific mathematical scale. Thus, Constructo's hulls were not manufactured to exact measurements because they were finished by hand rather than by machine and when one deals with something made by hand, allowances must be made for slight tolerances of accuracy. And in this vein, he testified that in the imported models the rigging lines for the foremasts are not in the same scale as the rest of the ships. The line used for this purpose is that which is commercially available and, in the opinion of the witness, for model building purposes is sufficient to represent the general feeling of the actual rigging on the ships. Additionally, the items found in the small packets included in the construction kits, such as silver eyelets representing port lights, pins used to fashion the davits, lifeboats, wheels, windlasses, anchors, etc., are not to scale; indeed, some of the selfsame items are included in kits or models of entirely different scales.

The witness pointed out that the superstructure of a ship refers to the deck detail and the cabin housing and that the superstructure of a scale model should be in precise scale. However, the witness indicated that in some instances superstructures may be changed over the years and thus differ from the original plans. Similarly, sail plans and the mast dimensions are occasionally changed during the life of a ship and hence would also differ from the original plans.

With regard to measurements in general, Mr. Rowsom testified that the term "length" could mean a number of things. Thus there is an overall length which is the length from the tip of the bowsprit to the stern or to the boom over the stern. Other lengths include the length of the deck and the water-line length. In this context, the witness stated that he checked the scale of each of the imported models by first obtaining from various unidentified publications figures allegedly representing a few basic measurements of the actual ships (such as length, width and depth). These measurements he referred to as "actual ship measurements." See plaintiff's exhibit 10. He then compared these "measurements" to his "model measurements" (*ibid.*)

which he secured by taking measurements from the assembled models or from the plans included in the construction kits. In this latter connection, he stated that while measurements of length, width and depth are important, a number of other measurements are necessary in order to determine whether components of the model such as the hull actually conform to scale specifications. Despite the necessity of such other measurements, the witness conceded that they were not taken.

Defendant's witness was Lt. Commander Richard Hinkle, an officer in the United States Coast Guard, who is a naval architect and marine engineer.[3] He testified that in 1966 he worked for a ship model builder and is thoroughly familiar with the use of ship models as an analytical tool in naval architecture and as a sales promotion item. Ship models are a necessary tool of naval architecture and for that purpose generally have an accuracy within plus or minus $\frac{1}{64}$ of an inch. The witness did not know, however, what tolerances are permissible in the trade for scale model ships and sets.

According to Commander Hinkle, scale is the manner in which dimensions are proportioned; thus, in a scale of 1 to 100, one foot on the drawing would represent 100 feet on the actual ship. Further, on a scale drawing, the various objects on the drawing must be increased or reduced according to the same scale. For example, the height, width and breadth dimensions must all be reproduced to the same scale to avoid distortion. Accordingly, if the length is reduced to one proportion and the breadth to another, the drawing is not a scale drawing.

In designing a ship, a preliminary design is made, following which a lines drawing containing a body plan is prepared. General arrangement plans and basic structural plans are also prepared. To duplicate the outside of a ship, the most valuable plan is the lines drawing, which can be developed from a body plan if the spacing is known.[4]

A ship cannot be duplicated on the basis of general arrangement plans because the views are not given at a sufficient number of different positions to develop it. There would be an infinite number of shapes

---

[3] The witness is presently chief of the search and rescue section in the engineering division of the Coast Guard. He graduated from the Coast Guard Academy in 1961; attended M.I.T. from 1964 to 1966 where he received a master of science degree in naval architecture and marine engineering. During his studies at M.I.T., he worked with a professional model maker developing a model which was subsequently used in a towing tank. He also spent four years as an instructor at the Coast Guard Academy teaching naval architecture and other subjects.

[4] The witness described a body plan thusly (R. 287):

The body plan is formed by passing planes that are vertical and perpendicular to the longitudinal center line of the ship or the longitudinal axis of the ship through there and the molded hull form, which were these planes at various stations along the length of the ship. The intersection of the hull form and the plane would form a line and these lines are portrayed in the body plan. It's quite similar if I took a loaf of bread and ran it through a slicer, if you took a look at the edge of each slice and use that as a line and drew them on there, this would be the body plan. If I ran a hull through the slicer, the lines of each section, I'd see at the outline.

that one could come up with that would be perversions of some basic form. Similarly, a ship cannot be duplicated on the basis of length, draft, and beam dimensions. As to this, the witness demonstrated that using the same length, beam, and draft one could come up with an infinite number of hull shapes—ranging from a rectangular box shape to a prism shape to a diamond shape. Hence, there would be an infinite number of ship hulls possible. In these circumstances, in order to duplicate a particular ship's hull, it is necessary to get a lines drawing or a good table of offsets.[5]

## The Law

Considering next the legal aspects, it is apparent that item 737.15, under which the imported merchandise was classified, makes no distinction as to the types of models or construction kits for the assembling of models, but encompasses all models or kits (not otherwise specifically provided for) whether or not of superior or inferior quality and craftsmanship or of high or low value. *Arthur R. Sawers* v. *United States,* 60 Cust. Ct. 593, 596, C.D. 3467, 285 F. Supp. 852, 853 (1968). It is, therefore, clear that item 737.15 is the appropriate provision for classification unless the plaintiff can establish that the imported merchandise is more specifically provided for in item 737.07 or 737.09 as claimed.

1. *Common meaning of the term "scale" as used in items 737.07 and 737.09.*

To support its claims, plaintiff contends that the use of the words "scale of the actual article" in item 737.07 does not refer to a specific individual unique thing but rather is a reference to various *eo nomine* classes of articles. For example, according to plaintiff, to constitute a model under item 737.07 an article need not be a particular trackside structure such as the Hempstead Station with all scale details thereof in conformance with the actual station; rather the article need only be identifiable as portraying a kind of trackside structure. Further, plaintiff maintains that under item 737.07 the presence of the word "scale" therein is merely to insure that the maximum size of a model classifiable thereunder be scaled to a ratio smaller than 1 to 85. It argues that since item 737.07 does not use the word "uniform" to modify the word scale, some parts of a model classifiable thereunder may be scaled to a ratio of 1 to 90, while other parts of the same model may be scaled to a ratio of 1 to 125. In other words, plaintiff insists that item 737.07 imposes no *uniform* scale requirement, but only a maximum size requirement.

---

[5] A table of offsets indicates the distance from the center line plane of the ship to the molded hull form at various heights above the base line or various water lines and at various stations or longitudinal positions along the length of the ship.

With regard to item 737.09, plaintiff argues that as in the case of item 737.07, there is no requirement that all of the prefabricated units for a model be in a *uniform* precise scale. Rather, in plaintiff's view, since item 737.09 does not use the word "uniform" in referring to "precise scale" some of the prefabricated units of a model kit may be of one precise scale, while other prefabricated units in the same kit may be of a different precise scale.

In view of these arguments, it is important to determine the common meaning of the word "scale" as used in items 737.07 and 737.09. On this phase, plaintiff's witness Rowsom testified (as noted previously) that "scale" for purposes of model building is that which is in "relative detail" although not all of an article's components have to be increased or reduced in the same proportion to be in scale. The witness added that the word "precise" means accuracy within certain tolerances which could be judged by the eye of an experienced model builder, although he did not know what these tolerances are.

In contrast, as shown by the various lexicographic definitions, the noun "scale" basically means a fixed or definite proportion which is used in determining the relationship of a representation to that which it represents; accordingly, the verb "to scale" means to make a drawing, pattern, projection of or model, according to scale, i.e., according to a fixed or definite proportion, and the adjective "scale" means drawn or constructed to scale.[6] This common meaning of the

[6] *Funk & Wagnalls New Standard Dictionary of the English Language*, pp. 2184–2185 (1956):

scale, v. * * * 2. To make a drawing, pattern, or projection of, according to scale; draft in proper proportion; as, to *scale* a building. * * * 4. To reduce according to a scale; cut down proportionally; as, to *scale* wages. * * *

scale, n. * * * 2. Any system of designating the magnitude of a unit of measurement, or the correspondence of two magnitudes, one of which is represented by the other; any system in which a fixed proportion is used in determining quantities; as, a *scale* of 1 inch to the mile; the *scale* of one-hundredth; a taxation *scale* of 2 percent. * * * scaled, pa. * * * 2. Measured or reduced to a required standard; * * *.

*Webster's Third New International Dictionary of the English Language, Unabridged*, p. 2023 (1963):

scale, n. * * * 1a(1): an indication of the relationship between the distances on a map, chart, or plan and the corresponding actual distances usu. in, the form of a direct statement (as 1 inch to 1 mile), a representative fraction (as 1/250,000 or 1:250,000), * * *.

scale, v. * * * 2c: to pattern, make, regulate, set, or estimate according to some proportion, rate, standard, or control: increase or reduce according to a fixed ratio * * *.

scale, adj.: drawn or constructed to scale (~map) (~drawing) (~model of an automobile).

*Audels New Mechanical Dictionary for Technical Trades*, p. 578 (1960):

scale drawing.—The reproduction or delineation of an object on a reduced scale, each unit of which bears a definite proportion to a unit of linear measurement by which the object itself is measured.

*Engineering Encyclopedia*, p. 1095 (1954):

Scale in Mechanical Drawing. The term "scale" is applied (1) to the graduated rule or instrument used in measuring linear dimensions and (2) the "scale of a drawing" indicates its size relative to the actual size * * *.

Frederic Swing Crispin, *Dictionary of Technical Terms*, p. 344 (1957):

scale * * * (2) The size of a drawing in relation to the size of the object represented.

scaled drawing — A drawing made smaller than the work which it represents, but to a definite proportion, which should be specified on the drawing itself.

*The American Heritage Dictionary of the English Language*, p. 1157 (1970):

scale * * * 3a. The proportion used in determining the relationship of a representation to that which it represents.

word "scale" was also that understood by defendant's witness Hinkle who (as indicated before) testified that in a scale drawing, the height, width, and breadth dimensions all should be reproduced to the same scale, and that a reduced drawing of a ship's hull, the length of which had been reduced to one proportion and the breadth to another proportion would not be a scale drawing of the hull in the formal context of a scale drawing, and that a model produced on the basis of such a drawing would be distorted.

From the foregoing, there is no basis for plaintiff's contention that inasmuch as Congress failed to preface "scale" by the word "uniform," Congress did not intend that each model provided in item 737.07 be constructed on the basis of one and the same scale. Similarly, there is no basis for the argument that a construction unit under item 737.09 need not be prefabricated on the basis of one and the same scale, whatever that scale may be, or that the individual units of a construction kit or set need not be made to one and the same scale. Such a reasoning is simply contrary to common meaning as well as common logic. A ship's hull prefabricated to at least two different scales (which is the case with respect to the present importations, as hereinafter discussed), can hardly be what Congress envisioned when it provided in item 737.09 for construction kits or sets with construction units prefabricated to *precise* scale. Such a hull is clearly not prefabricated to scale, much less to a precise scale. Further, the obvious reason for providing for a precise scale for the individual units is so that the entire model when assembled would equally be to precise scale. If each unit is prefabricated to a different scale, assuming such units can be assembled into one model, they would result in a completely distorted replica, not a scale model.

Plaintiff, however, argues that its position—that a scale article may be one built according to two or more different scales—is supported by the following statement in *Associated Hobby Mfrs., Inc.* v. *United States*, 60 CCPA 121, 123, C.A.D. 1093, 475 F.2d 654, 655 (1973):

> * * * [u]nder TSUS 737.09 there is no specific scale required for classification thereunder—HO or otherwise—so long as it is made to a "precise scale."

Manifestly this statement does not stand for the position thus urged by plaintiff. Rather, the statement stands for the proposition that under item 737.09 there is no specific scale required for classification thereunder, so long as the units are made to a *precise scale*. Thus, they still need to be made to *one* scale, whatever that scale may be.

2. *Legislative history of model provisions.*

Under the Tariff Act of 1930 the only specific provision for models was paragraph 1720 which provided for models of inventions and other improvements in the arts to be used exclusively as models. Models chiefly used for the amusement of children were classifiable as toys, while models chiefly used by adults were classifiable under various basket provisions.

In 1960, the Tariff Commission submitted to the Congress proposed new Tariff Schedules, including items 737.05 to 737.15 which covered various model articles and construction kits for assembling such model articles. *Tariff Classification Study – Explanatory and Background Materials*, Schedule 7, p. 266 (1960) (hereafter *Study*). With respect to items 737.05 to 737.15, the *Study* indicated (pp. 291–2) that toy trains, toy airplanes, and similar toy articles (frequently referred to as "model trains" etc.) and construction sets for such toys were combined with model trains, model airplanes, etc. and other model sets or kits, in order to eliminate the then existing difficulty of distinguishing between toys and non-toys. The *Study* went on to state (p. 292) that the existing provisions under the 1930 Act had caused continual dispute as to whether certain models, particularly trains, were toys for children or models for hobbyists, and that the constantly improving quality of "toy" trains made it increasingly difficult to find a workable set of criteria to distinguish between the two groups. For that reason, it was pointed out that the proposed initial schedule contained two provisions, i.e., item 737.10 with a rate of 19 percent for model construction kits or sets with units prefabricated to the precise scale of the finished article (which almost invariably were for hobbyists) and a second provision, item 737.15, with a rate of 35 percent (the applicable rate for toys) for all other models and construction kits or sets. *Study*, p. 292.

This proposal to combine all other models and construction sets at the rate of 35 percent drew strong opposition from importers who had been importing model trains and other model railroad equipment at a 13.75 percent rate of duty under paragraph 353 of the 1930 Tariff Act if they had an electrical device as an essential element or at 19 percent under paragraph 397 as non-specified articles of metal. *Ibid.*

The *Study* further indicated (p. 292) that as a result of the foregoing, item 737.07 was revised and "locomotives and other model railroad rolling stock covered by this practice have been narrowly described and provided for at the rate of 16 percent" which is the

weighted average of the two rates formerly applicable.[7] Item 737.07, as thus revised, appeared in the *Study* as follows (p. 266):

Other models, and construction kits or sets:

737.07    Locomotives and railroad rolling stock, each unit containing by weight over 75 percent of copper, assembled by hand and made to precise scale of the actual article_____ 16% ad val.

Subsequently, item 737.07 was further amended and enacted to read as follows (*Tariff Classification Study – First Supplemental Report* (1962), p. 80 (hereafter *First Supplemental Report*)):

Rail locomotives and rail vehicles; railroad and railway rolling stock; track, including switching track; rail depots, round houses, signal towers, water towers, and other trackside structures; trolley buses and trolley-bus systems; and cable-car systems; all the foregoing made to scale of the actual article at the ratio of 1 to 85 or smaller_____ ([8])

The following reason was given by the Tariff Commission for the amendment (*id.* at 81):

An effort was made to resolve the model train issue in the original draft schedule on which public hearings were held in December 1958. *As a result of testimony and statements received from an interested importer in connection with that hearing,* the provisions of item 737.07 were incorporated in the proposed schedule to preserve the substance of the practice with respect to locomotives and railroad rolling stock of types used by adult hobbyists. Other types of imports were brought to the attention of the Commission in connection with the public hearing on this first supplemental report in proposed form. The foregoing change in item 737.07 takes into account the latest existing customs practices in regard to this matter. See C.A.D. 746.[9] [Emphasis added.]

[7] There was no opposition to the proposed item 737.09 (which initially was item 737.10) for construction kits or sets prefabricated to the precise scale of the actual article. *Study*, p. 293.

[8] It is to be noted that the language for item 737.07 was adopted by Congress *in toto* from a suggested amendment contained in a memorandum submitted by a group of importers of HO and smaller scale railroad equipment which is reprinted in the *First Supplemental Report*, p. 417 (1962). See *Pacific Fast Mail* v. *United States*, 68 Cust. Ct. 41, 47–48, C.D. 4333, 338 F. Supp. 506, 511 (1972).

[9] C.A.D. 746 refers to *Polk's Model Craft Hobbies, Inc., et al.* v. *United States*, 42 Cust. Ct. 103, C.D. 2073 (1959), *aff'd*, 47 CCPA 137, C.A.D. 746 (1960) which held that miniature railroad locomotives, cars, track and accessories which had been manufactured to HO scale according to the rigid standards set up by the National Model Railroad Association, were not toys under the Tariff Act of 1930.

The testimony thus referred to was presented to the Tariff Commission in December 1958 by James F. Donnelly on behalf of the Pacific Fast Mail Co. In the course of that testimony, Mr. Donnelly pointed out the differences between (1) the extremely accurate scale models of railroad locomotives, diesel engines and rolling stock which contain "[a]s much detail as possible that the ingenuity of a hand craftsman can impart to an article * * *" and (2) other models. *Study*, p. 666. To illustrate, he presented samples noting their "extreme detail and faithful duplication in miniature." *Id.* p. 668. With regard to a sample of a model of the famous Mohawk New York Central locomotive, he testified (*id.* p. 669):

> * * * The detail is not stamped out from the body, but is separately added, and it is a very, very close and precise scale of the prototype unit.
>
> \*        \*        \*        \*        \*        \*        \*
>
> These models as the Commission can readily see, are constructed from solid brass—not plastic, not die cast or stamped common metal—*and the scale detail is true, including the pilot, hand rails, steps, piping and rivets. The stack, the bell, the whistle, and so forth.* [Emphasis added.]

Referring specifically to scale, Mr. Donnelly testified (*id.* p. 674):

> MR. SHEWMAKER. What do these specifications of the National Model Railroad Association embrace?
>
> MR. DONNELLY. They embrace "scale," which is the manufacture of a miniature model conforming to its full-size prototype.
>
> In other words, one of these locomotives is a faithful prototype of the New York Central Mohawk, in that what is 1 foot long on the actual locomotive used by the New York Central may be one-tenth of a millimeter in the Tenshodo model, or the United model.
>
> \*        \*        \*        \*        \*        \*        \*
>
> MR. SHEWMAKER. Do you know * * * how these specifications are arrived at, and whether they are subject to change?
>
> MR. DONNELLY. They are subject to change in the sense that the hobbyist wants more and more perfection. He would prefer to have every single valve on a New York Central locomotive duplicated in his miniature, even if he had to use a microscope in order to find it in the miniature.
>
> He would like to see it there. And to that extent the association is continually seeking more and more perfection of detail, more and more precise duplication in miniature of a feature which exists in the prototype full size locomotive for business use.
>
> \*        \*        \*        \*        \*        \*        \*

MR. HART. Mr. Donnelly, are any of the Lionel or other toy trains made to scale?

MR. DONNELLY. To a degree, yes. But as I pointed out in my remarks to the Commission, particularly on the wheels, they are not to scale. The flanges of the wheels are so designed they can stand abuse and run on improperly laid track.

The trains represented here require proper flanging of wheels to run on track, which is also gaged and to scale. In this "HO" field and in this category of model trains, the track itself has to be laid to scale, and the width of rail must be to scale.

In addition, the National Model Railroad Association (NMRA), by letter to the Tariff Commission dated November 29, 1961, endorsed the adoption by the Commission of a clear and distinct definition of a scale railroad model. *First Supplemental Report*, p. 418. In that letter, NMRA represented that it was an organization made up of adults who were devoted to the construction and/or operation of miniature railroads, with facilities and equipment scaled from the prototype, and that it was concerned with any effort to classify the intricate and carefully constructed scale replicas that form a part of the hobby of model railroading in the same category as toys. *First Supplemental Report*, p. 418.

Relevant, too, is a letter of August 26, 1961 written to the House Committee on Ways and Means, on behalf of E. Suydam & Company, a manufacturer of HO scale model railroad kits and importer of handcrafted scale models of original interurban and electric railway equipment. *Id.* pp. 1020-4. The letter stated that overseas model makers work from reduced copies of the actual blueprints and dimensional plans obtained from the original railroad manufacturers and reaffirmed that scale models should conform to the applicable standards set by the NMRA. The letter was accompanied by a catalogue partly devoted to histories of original railways, photos of original cars and description of the models, exhibiting how closely they were built to resemble the originals. *Ibid.*

From the above, it is clear that item 737.07 was created as an exception to a general provision for other models in item 737.15 and was intended to cover intricate and carefully constructed scale replicas of actual prototypes manufactured according to strict standards and requirements. By the same token, item 737.09 was intended to encompass construction kits or sets with construction units prefabricated to precise scale of the actual articles.

In addition, S. Rep. No. 530, 89th Cong., 1st Sess. (1965) makes it evident that Congress intended that to be assessable at the lower

737.07 duty rate scale models of ships must meet the same high standards as model railroads. That report explained the provisions of a bill which ultimately was enacted as the Tariff Schedules Technical Amendments Act of 1965, Pub. Law 89–241, 79 Stat. 933, and which, among other things, added the words "ships and harbor structures; and airplanes and spacecraft" to item 737.07. With regard to the ship model amendment, the report stated (p. 21):

> *Section 72.  Models*
>
> Subsection (a) of this section would amend the article description for item 737.07 so as to include therein scale models of highway vehicles, ships and harbor structures, and airplanes and spacecraft. These models are comparable to the scale railroad and other models already provided for in item 737.07 and were entitled to the same rate treatment under the old tariff schedules.

Thus to be classifiable under item 737.07, ship models had to be comparable to scale railroad models which, as represented to Congress, were required to consist of accurate scale replicas of actual prototypes that were manufactured according to well-known strict requirements and standards.[10]

## The imported models do not meet the requirements of item 737.07

### 1.  *The Juan Sebastian Elcano*

The record demonstrates that the actual Juan Sebastian Elcano has the following dimensions, as authenticated by the chief engineer of the Naval Architecture Section in Madrid:

Length, prow to stern   —   79.247 m.[11] [or approx. 260 ft.]
Length overall   —   94.107 m.  [or approx. 308.7 ft.]
Beam   —   13.106 m.  [or approx. 43 ft.]
Draft   —   8.687 m.  [or approx. 28.5 ft.]

It is to be noted   (1)   that the scale of the purported model of this ship is stated to be 1 foot to 205 feet and   (2)   that a comparison of the model with the plan thereof contained in the construction kit indicates that the plan approximately depicts the model. Thus, any measurement of, and any conclusions reached with regard to, the model shown on the plan are equally applicable to the model.

With these considerations in mind, based on the unchallenged calculations of defendant's witness Hinkle, the measurement of the

---

[10] The specific references to scale models of actual and existing prototypes negate plaintiff's contention that to be classifiable under item 737.07 the finished model need not be a scale model *of a particular actual ship* with all of the features and characteristics of that particular ship "so long as it is a kind of ship such as a well-known class of ship—i.e., clipper ship, star class sailboat, etc." See plaintiff's brief, pp. 10–12.

[11] 1 meter equals 39.37 inches or 3.28 feet.

model shown in the plan in the kit results.in an overall length of 22.468 inches, which at the scale of 1 to 205 equals 384 feet as the overall length of the ship. On the same basis, the beam on the plan measures 2.69 inches, which at the scale of 1 to 205 equals 46 feet as the width of the ship. When it is considered that the overall length of the actual ship is 308.7 feet and the beam 43 feet, while the model extrapolated to scale has an overall length of 384 feet and a beam of 46 feet, it is apparent that the model is not built to scale of the actual article as required by item 737.07 but is a model built to a distorted scale.

Further, given (1) the figures of 308.7 feet for the overall length of the actual ship and 43 feet for the beam, and (2) the overall length of the model on the plan as 22.468 inches and the width 2.69 inches, the length overall of the model is at a scale of 1 to 165, whereas the beam scale is 1 to 193. Obviously, a model built not to one particular scale of the actual article but to several different scales is not a model built to scale of the actual article.

It is also to be observed that plaintiff's witness Rowsom measured the "length on deck" (i.e., the length of the prow to the stern) of the purported model of the Juan Sebastian Elcano and obtained a measurement of 1.5 feet. See plaintiff's exhibit 10. At the scale of 1 to 205, this would translate to a length of 307.5 feet. However, the actual length prow to stern of the Elcano is 260 feet—which is an additional indication that the model in question was not built to actual scale.

Finally, the record is uncontradicted that the dimensions of the Elcano which appear in the record are entirely insufficient as a basis for constructing a scale model of that ship; indeed, from these dimensions, an infinite number of forms could be developed.

2. *The Great Republic*

No plans or specifications for the Great Republic are contained in the record. On the contrary, all that appears in the record are a few dimensions from two books (plaintiff's exhibits 11A – 11D) to show what plaintiff's witness Rowsom referred to in his testimony (R. 228) when he stated he had been able to get specifications for the Great Republic from printed documents for the purpose of comparing the measurements of the actual ship against those shown on the model's plan. The dimensions for the Great Republic as listed in these exhibits are "335 feet, by 53 feet, by 38 feet" with a registered tonnage of 4,555, plus a somewhat more detailed description of the masts. They do not contain a profile of the hull, much less a body plan or a line drawing. On the basis of these dimensions, it is virtually impossible to construct a scale model of the actual ship.

Further, plaintiff's witness Rowsom testified that the overall length of the model as shown on the plan contained in the construction kit was about 20 inches, which when converted according to the given scale of 1 to 265, does not equal 335 feet—the length of the Great Republic—but rather equals 441 feet. Put otherwise, on the basis of Rowsom's measurement, the overall length of the model is built to a scale of 1 to 201 rather than to the given scale of 1 to 265. Further, according to Rowsom, the width of the model measures 0.198 feet, which at the given scale of 1 to 265 comes out to approximately 53 feet—the width of the ship.

These disparities make it obvious that the model has not been built to one particular scale, but on the basis of two or more scales and is not a model built to scale of the actual article as contemplated by item 737.07.

3. *The Cruz del Sur* (*The Southern Cross*)

As in the case of the Great Republic, no plans or specifications for the Cruz del Sur are contained in the record. And as in the case of the Great Republic all that appears in the record are three dimensions which Mr. Rowsom testified he obtained from various publications. These dimensions are 134 feet for the overall length, 114 feet for the length of the hull and 26 feet for the width. See plaintiff's exhibit 10. But even assuming these dimensions are correct, they are clearly insufficient to enable one to construct a scale model of the actual ship.

Plaintiff's witness Rowsom measured the overall length, length of hull and width of the model and came up with figures of 1.4 feet, 1.1 feet, and 0.25 feet, respectively. See plaintiff's exhibit 10. At the indicated scale of 1 to 100, this would translate to (i)   an overall length of 140 feet as compared with the ship's length of 134 feet; (ii)   a hull length of 110 feet as compared with the length of the ship's hull of 114 feet; and   (iii)   a beam of 25 feet as compared with the ship's beam of 26 feet. On the basis of Rowsom's calculations, the overall length of the model is at a scale of 1 to 95.7, the length of the hull is at a scale of 1 to 103.6, and the beam is at a scale of 1 to 104.

Defendant's witness Hinkle also measured the model in question and came up with figures of 18⅜ inches or 1.51 feet for the overall length and 14½ inches or 1.2 feet for the length of the hull while his measurement of the beam of the model as shown in the plan is 3 inches or 0.25 feet. On the indicated scale of 1 to 100, the overall length of the model based on Hinkle's measurements expands to 151 feet, the length of the hull expands to 120 feet, and the beam to 25 feet. Upon comparing these figures with the ship's overall length of

134 feet, its hull length of 114 feet and its beam of 26 feet, the overall length of the model is at a scale of 1 to 89, the length of the hull is at the scale of 1 to 95, and the width or beam at the scale of 1 to 104.

Thus, once again the record shows that the imported model has not been built to one particular scale but to several different scales and therefore is not a model built to scale of the actual article as contemplated by item 737.07.

## The imported construction kits or sets do not meet the requirements of item 737.09

As previously discussed, item 737.09 is intended to cover only construction kits or sets for making or assembling ship models with construction units prefabricated to one and the same scale of the actual articles. Plaintiff not only has failed to present competent evidence to support its claim for classification of the imported kits or sets under item 737.09, but the record in its entirety supports the government's findings, inherent in the classification under item 737.15, that the kits do not meet the requirements of item 737.09 and hence are not more specifically provided for under that item.

### 1. *The Juan Sebastian Elcano kit*

Plaintiff's exhibit 2 purports to result, when assembled, in a scale model of the Juan Sebastian Elcano. However, no evidence was introduced which would show characteristics and detailing which distinguish the Juan Sebastian Elcano from other ships. In fact, as previously discussed, the available facts establish that the resulting model is not a scale model of the Juan Sebastian Elcano and that the units of the imported sets or kits have not been prefabricated to scale, much less to precise scale.

It has been observed earlier that the length of the Juan Sebastian Elcano, prow to stern, is approximately 260 feet and that its overall length is approximately 308.7 feet. Hence, if the prow to stern length on the plan in plaintiff's exhibit 2 is measured and converted according to the given scale of 1 to 205, the result should be 260 feet. Similarly, if the overall length is measured and converted according to the scale, the result should be 308.7 feet. However, this is not the case. For as already pointed out when the prow to stern length of the model is measured and converted, it results in approximately 307 feet rather than 260 feet, and when the length overall is measured and converted, it results in approximately 384 feet rather than 308.7 feet. Clearly, when the dimensions of key components of the model are constructed to different scales, neither of which is to the purported scale of the

model, they cannot be considered as prefabricated to scale, much less to precise scale, of the actual ship.

### 2. The Great Republic kit

Plaintiff's exhibit 4 purports to result, when assembled, in a scale model of the Great Republic. However, as previously indicated, the record establishes that the resulting model is not a scale model of the Great Republic, and thus the units of the imported sets or kits have not been prefabricated to scale, much less to precise scale.

Beyond that, Mr. Rowsom conceded that he had not seen any original or reconstructed plans for the Great Republic which had burned down to the water line on its original voyage, but was basing his conclusions on a few published dimensions of the Great Republic as well as pictures and photographs.

The published descriptions of the Great Republic basically indicate that it was a clipper ship. However, while all clipper ships (i.e., exceptionally fast sailing vessels developed in the United States primarily between 1830 and 1860) had certain characteristics (such as a heavy and lofty rig, usually consisting of three masts and a sharp hull), the hull lines of clipper ships varied from ship to ship. See 5 Encyclopaedia Britannica, pp. 930–931 (1969). In this circumstance, it is virtually impossible (as previously indicated) to construct a scale model of the actual ship on the basis of the published dimensions of the Great Republic, i.e., 335 feet by 53 feet by 38 feet.

Further, reference has already been made to the fact that on the basis of measurements made by plaintiff's witness, the overall length of the model is at a scale of 1 to 201, while the width is at a scale of 1 to 265—which is the indicated scale. Thus again, since the dimensions of key components of the model are constructed to different scales, they cannot be considered as prefabricated to scale, much less to precise scale.

### 3. The Eagle kit

Plaintiff's exhibit 5 purports to result, when assembled, in a scale model of the U.S. Coast Guard vessel Eagle. However, the record establishes that the resulting model is not a scale model of the Eagle, and that the units of the imported kits or sets have not been prefabricated to scale, much less to precise scale.

First, defendant's witness Hinkle, who made three cruises aboard the Eagle, testified that there are a number of major discrepancies between the model, as shown on the plan included in plaintiff's exhibit 5, and the actual Eagle. For that reason he stated that if he were to visit a ship's deck as portrayed in the plan included in plaintiff's

exhibit 5, he would not recognize it as the ship deck of the Eagle. Among the many discrepancies were omission of doors and accesses; omission of the "Captain's coffin," a large (5½ feet by 5½ feet by 9 feet) steering gear mechanism and one of the more interesting visitors' attractions of the ship; the presence of a non-existent windlass instead of skylights; and the omission of a two-headed motor-operated windlass.

That well-known characteristics of a ship are important was demonstrated by Mr. Rowsom's testimony when he was asked to identify a photograph of the Eagle. It was the detailing on the ship that enabled him to identify the photograph as that of the Eagle; otherwise he would have thought it to be either the Eagle or somebody else's school ship, depending on the location. Thus, clearly, without the characteristics and the detailing which make the Eagle recognizable as such, a model cannot be considered a model of the actual ship, i.e., the Eagle. Similarly, the construction kit or set for the assembly of a model of the Eagle, without the characteristics and detailing of the Eagle, cannot be considered as a construction kit or set for the assembly of the model of the Eagle.

What is more, even if it were held that a crude model is a model of the actual article (in this instance the Eagle), such crude model cannot be sufficient for purposes of item 737.09 which requires that the construction units of the sets or kits be built to *precise scale* of the actual article. Construction units which, when assembled, will result in a *crude* model, which omits important characteristics and detailing of the actual ship, cannot be considered as having been prefabricated to scale, let alone to precise scale.

It is also to be noted that the plan in plaintiff's exhibit 5 contains a figure similar to a body plan. A comparison of this figure with the actual body plan of the Eagle shows that the former does not represent the body plan of the Eagle and would result in a flat-bottomed hull with very little dead rise as opposed to a hull with a significant amount of dead rise and a bottom which slopes up very rapidly from the keel. Similarly, a comparison of the hull in plaintiff's exhibit 5 with the body plan of the Eagle reveals that the "below water" portion of the hull is flat-bottomed, whereas according to the body plan it should have a great deal of dead rise.[12] Even assuming that a model hull

---

[12] In its brief, plaintiff (pp. 14–15) contends that while a sailboat needs a heavy keel to avoid capsizing in a stiff breeze, to avoid an ugly model which would consist largely of the inconspicuous underwater hull, a model of a sailboat will often be made with a hull that is shortened in depth, or somewhat flattened on the bottom for mounting on a stand. There is no testimony as to how other model sailboats are made. To the extent that the instant importations have shortened keels, which plaintiff now appears to have conceded, they obviously cannot be considered as being built to precise scale of the actual ships.

that is not built to the plans of the actual ship can be considered as a model of the hull for that particular ship, it certainly cannot be considered as having been built to scale of the actual ship, much less to precise scale.

Finally, Rowsom's testimony shows that the Eagle kit was produced by Constructo at Preston's request. Rowsom had never seen the plans for the Eagle, but sent Constructo plans of the Eagle's sister ship, the Gorch Fock, as contained in a marine publication and asked Constructo to produce a kit from such plans. Mr. Rowsom conceded, however, that the Gorch Fock and Eagle were not the same length and that there could be other differences as well. In addition, the witness had no personal knowledge as to how the Eagle kit was actually prepared since he did not know what Constructo did with the plans he had sent it.

### Whether construction kits or sets for making or assembling model articles are provided for under item 737.07

Plaintiff alternatively contends that construction sets or kits are covered by item 737.07 because the superior heading common to both items 737.07 and 737.09 reads "Other models, and construction kits or sets" and because, by reason of General Interpretative Rule 10(h), item 737.07 includes unassembled or unfinished model articles. However, in view of the court's finding that the construction units in the kits are not made to the scale of the actual articles, they would not in any event be classifiable under item 737.07, assuming that provision were applicable. But even apart from that, it must be concluded, for the reasons that follow, that item 737.07 is not applicable to construction kits for making or assembling models and that plaintiff's argument to the contrary is without merit.

General Interpretative Rule 10(h) provides that *unless the context requires otherwise*, a tariff description for an article covers such article, whether assembled or not assembled, and whether finished or not finished. Thus, if an article description merely provided for models or model articles, conceivably it would include assembled as well as unassembled models. But that is not the case here. The superior heading applicable to *all* of the model provisions, including items 737.05, 737.07, 737.09 and 737.15, specifically enumerates *both* model trains, model airplanes, model boats, and other model articles, *and* construction kits or sets for making or assembling such models. Similarly, the inferior heading applicable to items 737.07, 737.09, and 737.15, provides for both models *and* construction kits or sets. Thus,

the plain meaning of the statutory language is that models or model articles are to be differentiated from construction kits or sets for making or assembling such model articles, and that a provision for models or model articles does not encompass construction kits or sets for making or assembling such model articles. This is the exact situation referred to in General Interpretative Rule 10(h). Here the context requires that a tariff description for models or model articles does not include unassembled and/or unfinished models or model articles in the form of construction kits or sets for the making or assembling of such articles.

That item 737.07 may not cover all assembled models, which when imported in the form of construction kits or sets may be provided for under item 737.09, or that item 737.09 may not cover all construction kits or sets which when assembled may be provided for under item 737.07 is immaterial. This is because all merchandise enumerated in the superior heading applicable to items 737.05 through 737.15 and not specifically provided for under items 737.05, 737.07, and 737.09, is provided for under item 737.15. The nub of the matter is that to accept plaintiff's interpretation would be to ignore the plain meaning of the statutory scheme and to hold the words "construction kits or sets" contained in *two* headnotes as being superfluous and of no meaning and significance.

## Plaintiff failed to meet its burden of proof

In the present case, there were many ways in which plaintiff could have met its burden of proof in establishing that the imported ship models were made to scale of the actual ships they purport to represent and that the imported construction kits or sets consist of units which were prefabricated to precise scale of the actual ships they purport to represent. That plaintiff completely failed to meet its burden of proof, however, is apparent from the record in its entirety.

As shown by the record, plaintiff attempted to meet its burden of proof by relying on unsubstantiated, unauthenticated, and incomplete plans and illustrations found in books, which did not necessarily represent the ships involved; on a few dimensions found in various publications; and on broad, general conclusory statements made by Mr. Rowsom, executive vice president and general manager of Preston.

It is also worthy of note that plaintiff produced no testimony from the manufacturer, Constructo. There is no testimony that Constructo ever possessed either the original plans and specifications for the actual ships or any true copies thereof, or even any accurately reduced plans

and specifications therefor. There is no testimony that Constructo manufactured the assembled ships and prefabricated the construction units of the construction kits or sets in conformity with any plans and specifications of the actual ships. There is no testimony that Constructo ever attempted to incorporate in the assembled models or kits even the more significant details and characteristics of the actual ships. While Mr. Rowsom had forwarded a book (plaintiff's exhibit 14) containing purported plans of ships to Constructo, he did not know what Constructo did with the book and testified that at the time that Preston started purchasing from Constructo, the latter was already manufacturing the various articles, except for the Eagle.

Moreover, plaintiff produced no testimony from someone experienced in reading and interpreting ship plans and specifications, and in building ship models and construction kits, for such purposes as (1) comparing the limited plans and specifications introduced on behalf of plaintiff with representative samples of the imported assembled ship models and with representative samples of the imported construction kits or sets; (2) showing in what manner the importations did conform to the characteristics and specifications of the actual ships; (3) setting forth qualifications and requirements for scale model ships and scale model construction kits as opposed to "nonscale" model ships and construction kits; and (4) setting forth what tolerances and minor deviations, distortions and omissions are permissible in the trade for scale model ships and sets.

## Conclusion

In summary, the court overrules plaintiff's claims for classification of the importations under items 737.07 and 737.09 and affirms their classification under item 737.15. Judgment will be entered accordingly.[13]

---

[13] At a pretrial conference, plaintiff's counsel abandoned Court No. 69/40347 which covered purported ship models of the Mayflower and H.M.S. Bounty. Accordingly, that case is hereby dismissed.